AO (Rev. 5/85) Criminal Complaint

**FILED**
**ORLANDO, FL**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

AUG 1 5 2002

U.S. MAGISTRATE JUDGE

**SEALED**

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

vs.

CASE NUMBER: 02-3112-01 - 22

BOBBY LOUIS BELLAMY, a/k/a "Fat Boy", "Bootie", "B"
RAY ABLE, a/k/a Victor Fogo, a/k/a "Dred", a/k/a "D", a/k/a "Big J"
HUGHON EVERDELL BROWN, a/k/a Anthony Jorif Meah
AINSWORTH E. BROWN, a/k/a "M.D."
PATRICK ANTHONY HUGHES, a/k/a "Patrick", a/k/a Harry McLeod
TONEY DUNKLEY
JERRY VEGA ORTIZ, a/k/a "J"
PATRICK NATHEL PERRY, a/k/a "Bird"
JOE NATHAN BELLAMY, a/k/a "J.B.", a/k/a "Little Joe"
ALBERT MOSSELORS HOPKINS, a/k/a "Al"
TEXAS ARNELL GOBERN, a/k/a "Tex"
WILLIE H. MURPHY, a/k/a "Coop"
PAUL DEMETRIUS SMITH, a/k/a "P Diddy"
GREGORY BRUCE GALIN, a/k/a "Greg"
JEFFREY WAYNE GREATHOUSE, a/k/a "Jeff"
JAMES RUDOLPH CHILES, a/k/a "Quick"
AUBREY BROWN, a/k/a "A.J"
SHELDON JERROD JOHNSON, a/k/a "Slap", a/k/a "Slaprock"
KRISTINA ANN GUSE, a/k/a "Krissy", a/k/a "Kris"
COURTNEY NICOLE BRADLEY
DONEA EVANELLA FUSON
ERICA RENEE RAMIREZ

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning on or about an unknown date but from at least in or about January, 2000, and continuing through on or about the date of this complaint, in Orange County, in the Middle District of Florida, the defendants did conspire to possess with intent to distribute and did distribute 5 kilograms or more of cocaine hydrochloride and 50 grams or more of cocaine base and a quantity of a mixture and substance containing a detectable amount of 3, 4 methylenedioxymethamphetamine (MDMA), in violation of Title 21, United States Code, Sections 846 and 841(a)(1). I further state that I am a Special Agent, U.S. Drug Enforcement Administration, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:   ☒ Yes  ☐ No

Signature of Complainant
SA John Hegarty, DEA

Sworn to before me and subscribed in my presence,

_____   at   Orlando, Florida

KARLA R. SPAULDING
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

SCANNED

N:\MPerry\bellamy_2002r01191\complaint and arrest warrants\f_complaint.wpd

STATE OF FLORIDA
COUNTY OF ORANGE                    CASE NOS. 02-3112-01-22
                                            02-3113-01-11


## MASTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, John P. Hegarty, after being duly sworn, depose and state as follows:

1.      I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed for approximately 3 ½ years. I am presently assigned to the Miami Field Division of DEA, Orlando District Office.

2.      During my employment with the DEA, I completed an intensive 16-week training program at the DEA academy in Quantico, Virginia. This academy provided me with a background and basis of knowledge relating to the investigation of drug-related crimes in violation of Title 21 of the United States Code. Prior to becoming employed by DEA, I was employed by the Commonwealth of Massachusetts as a State Public Defender for approximately four years. During 1994, I obtained a Juris Doctorate from Suffolk University Law School in Boston, MA.

3.      I have experience in the investigation of violations of federal and state narcotics laws. I have conducted or have actively participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors or suppliers and the seizure of controlled substances and U.S. currency. I have also received training in drug identification, interview and interrogation techniques, drug smuggling and concealment methods, handling of confidential informants and cooperating defendants, drug interdiction, and drug distribution methods. I have conducted investigations relating to the laundering of monetary instruments derived from the sale and distribution of illegal drugs. To

successfully conduct these drug and financial related investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, undercover law enforcement personnel, informants or cooperating defendants, and review of historical-in-nature documentary and financial records. Based on my training and experience, conversations with other law enforcement personnel, and conversations with narcotics traffickers themselves, I have become familiar with the manner in which drug traffickers smuggle, transport, store and distribute narcotics, as well as how they collect and launder drug-related proceeds.

4.     I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and attempt to thwart law enforcement investigations.

5.     I have attended drug and financial-related specialized training courses. I have testified in all aspects of the federal and state judicial systems. Further, I have participated in the prior seizure of several large quantities of controlled substances, including cocaine hydrochloride, cocaine base, ecstasy, and other controlled substances. Consequently, I have gained specific experience in this regard.

6.     On the basis of my training and experience in conducting prior drug investigations, I have become familiar with the manner in which large-scale drug traffickers and drug trafficking organizations operate. I have participated in the sale and purchase of controlled substances ranging from street level to pound or kilogram quantities and have become knowledgeable with the methods utilized in the sale, manufacture and distribution

2

of controlled substances.  In addition to other matters, I have learned the following:

(a)     That it is common for drug traffickers to maintain books, records, receipts, notes and ledgers relating to the purchase, sale, distribution and/or manufacture of drugs; that the aforementioned books, records, receipts, notes and ledgers are maintained where the traffickers have ready access to them.  These records can be in the form of bills of lading, contracts, airway bills, delivery receipts, billings, manifests, labels, log books, fuel receipts, motel/hotel receipts, airline tickets, flight itineraries, and credit card charges; and

(b)     That it is common for drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, businesses, residences of relatives and associates, safe deposit boxes and/or locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement; and

(c)     That it is common for drug traffickers to maintain evidence relating to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds such as: large amounts of United States currency, financial instruments, books, records, bank statements and related records, bank drafts, cashiers checks, keys to safe deposit boxes, and evidence of other financial transactions.  These items are maintained within their residences, businesses, safe deposit boxes, storage lockers, and/or locations over which they exercise dominion and control; and

(d)     That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and individuals who are involved in their drug trafficking activities; and

3

(e)     That drug traffickers commonly store and maintain narcotics and items utilized in the packaging, manufacture and distribution or those narcotics within their residences, businesses or other locations over which they exercise dominion and control and to which they have ready access; and

(f)     That members of this criminal organization already arrested and those members still under investigation have utilized their residences on a continuing and long-term basis, in addition to vehicles, to distribute, store, and/or transport illegal drugs; and

(g)     That based upon my training and experience, that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms and related ammunition. These firearms include handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug traffickers's property. Such property may include, but is not limited to, narcotics, jewelry, drug paraphernalia, books, records, U.S. currency, etc.; and

(h)     There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directorates, check books, videotapes, maps, photographs, utility records, ownership boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. Oftentimes, documentary evidence exists after the criminal activity has been

concluded. Evidence related to the long-term ongoing criminal nature of a structured group of individuals is commonly found where the traffickers have frequented, visited, or remained for periods of time. These locations include where the traffickers reside, or those places that their criminal associates visit or otherwise maintain dominion, control and accessibility; and

(i)    That persons who distribute illegal drugs often utilize cell phones, pagers and other telecommunications devices to conduct their illegal transactions. Traffickers also utilize these electronic devices and computers to aid in the storage, transfer or concealment of proceeds derived from their criminal activity. These cellular telephones, pagers, and other telecommunication devices are maintained within their residences, and/or other locations over which they exercise dominion and control. The suspected drug traffickers as noted below in this affidavit have extensively utilized cellular telephones to facilitate their illegal activity throughout this investigation; and

(j)    That some members of the drug-trafficking organization being investigated are illegal aliens in the United States, primarily from Jamaica; and

(k)    That some members of this organization previously arrested have utilized fictitious names in an effort to avoid detection, thwart further investigation of their illegal activities, and to conceal their true identity; and

(l)    That drug traffickers often communicate with their drug trafficking associates through the use of cellular and residential telephones and that drug traffickers often change telephone numbers in an effort to thwart law enforcement's use of electronic surveillance; I am also aware that drug traffickers often speak in guarded or coded language when

discussing their illegal business over the telephone in an effort to further prevent detection.

7.    I have personally conducted the investigation, which is the subject of this affidavit, and am familiar with the facts and circumstances outlined below.  The facts and information contained in this affidavit are based upon my personal knowledge derived from my participation in this investigation.   During this investigation, I have learned the information outlined below about **Bobby Louis BELLAMY** and his criminal associates. This information derives from consensual recordings of wire communications and face-to-face meetings, NCIC or court records, confidential sources, cooperating defendants in other cases, telephone records, surveillance, and information provided to me by law enforcement officers from DEA, the Orlando Police Department, the Orange County Sheriff's Office, the Metropolitan Bureau of Investigation (MBI), and the Bureau of Alcohol, Tobacco, and Firearms (ATF). This affidavit also contains information from the following sources:

(a)    Oral and written reports about this and other investigations which I have received from members of the DEA, state and local law enforcement agencies and other federal agents;

(b)  Physical surveillance conducted by DEA, other federal agents, or state and local law enforcement agencies in this and other investigations, which has been reported to me either directly or indirectly;

(c)    Pen register, trap and trace information, telephone tolls, electronic surveillance and other documentary evidence in this and other investigations;

(d)    Evidence gathered through other law enforcement investigations;

6

(e)  Interviews of several confidential sources of information or cooperating defendants utilized during this investigation.  These individuals are both male and female.  All cooperating individuals, irrespective of their sex, will be referred to below in the masculine gender;

(f)  Previous enforcement activity related to the seizure of cocaine hydrochloride, cocaine base, ecstasy or other controlled substances, and U.S. currency related to this investigation.

8.  This affidavit contains information necessary to support probable cause for this application.  It is not intended to include each and every fact and matter observed by me or known to the government.

## DEFENDANTS AND OFFENSES

9.  Based upon the facts enumerated below, there is probable cause to believe that **Bobby Louis BELLAMY** (a/k/a "Fat Boy", "Booty", or "B"), **Ray ABLE** (a/k/a Victor Fogo, "Dred", "D", or "Big J"),  **Hughon Everdell BROWN** (a/k/a "Anthony Jorif Meah"), **Ainsworth E. BROWN** ("M.D."), **Patrick Anthony HUGHES** (a/k/a  "Patrick" or Harry McLeod), **Toney DUNKLEY, Jerry Vega ORTIZ** (a/k/a "J"), **Patrick Nathel PERRY** (a/k/a "Bird"), **Joe Nathan BELLAMY** (a/k/a "J.B." or "Little Joe"), **Albert Mosselors HOPKINS, Jr.** (a/k/a "Al"), **Texas Arnell GOBERN** (a/k/a "Tex"), **Willie H. MURPHY** (a/k/a "Coop"), **Paul Demetrius SMITH** (a/k/a "P Diddy"), **Gregory Bruce GALIN** (a/k/a "Greg"), **Jeffrey Wayne GREATHOUSE** (a/k/a "Jeff"), **James Rudolph CHILES** (a/k/a "Quick"), **Aubrey BROWN** ("A.J."), **Sheldon Jerrod JOHNSON** (a/k/a "Slaprock" or "Slap"), **Kristina Ann**

7

GUSE (a/k/a "Krissy" or "Kris") , **Courtney Nicole BRADLEY, Donea Evanella FUSON,** and **Erica Renee RAMIREZ,** have knowingly, unlawfully, and intentionally combined, conspired, confederated and agreed together and with others to commit the following offenses: (a) the distribution and possession with intent to distribute cocaine hydrochloride (HCL), cocaine base (commonly referred to as "crack"), and 3, 4 methylenedioxymethamphetamine (MDMA) (commonly known as Ecstasy), and/or other controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); (b) the use of communications facilities in commission of narcotics offenses, in violation of Title 21, United States Code, Section 843(b); (c) attempts and conspiracies to commit the aforementioned crimes, in violation of Title 21, United States Code, Section 846; and (d) aiding and abetting the aforementioned crimes, in violation of Title 18, United States Code, Section 2.

10. Your Affiant and others have fully identified the persons named above, as follows:

(a) **Bobby Louis BELLAMY**, B/M, DOB 07/29/1967, SSN 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, FBI# 517499HA7; address: **5925 Danube Way, Orlando, Florida 32807;**

(b) **Ray ABLE**, B/M, DOB 07/05/1973, SSN none known, FBI# 790352JB1; former address: presently incarcerated within Seminole County Jail;

(c) **Hughon Everdell BROWN**, B/M, DOB 11/03/1971, SSN none known, FBI# 712509MA6; presently incarcerated in the Osceola County Jail, inmate# 310784;

(d) **Ainsworth E. BROWN**, B/M, DOB 01/18/1975, SSN 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, FBI#213582WB6; address: **548 Bamboo Harbor Court, Apartment #205,**

Orlando, Florida;

(e)  **Patrick Anthony HUGHES**, B/M, DOB 06/23/1969, SSN unknown, FBI# 620513LA7; address: 6619 Hiawassee Meadow Drive, Orlando, Florida 32818;

(f)  **Toney DUNKLEY**, B/M, DOB 10/09/1976, SSN none known, FBI# 523950VB4; address: 5424 Fitness Circle, Apartment #202, Orlando, Florida 32809;

(g)  **Jerry Vega ORTIZ**, W/M, DOB 07/06/1973, SSN 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; FBI# 103591TA9; address: **5048 Eastwinds Drive, Orlando, Florida 32819** (West Winds Apartments) ;

(h)  **Patrick Nathel PERRY**, B/M, DOB 12/19/1967, SSN 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, FBI# 533265HA7; address: **12642 Old Castle Drive, Orlando, Florida 32837;**

(i)  **Joe Nathan BELLAMY**, B/M, DOB 02/19/1970, SSN 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, FBI# 602431JA5; address: **4816 Manduria Street, Orlando, Florida 32819;**

(j)  **Albert Mosselors HOPKINS**, B/M, DOB 03/25/1952, SSN 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, FBI# 721288J8; address: 5131 Steyr Street, Orlando, Florida 32819

(k)  **Texas Arnell GOBERN**, B/M, DOB 07/08/1978, SSN 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, FBI# 50145XA3; associated address: 5125 Polaris Street, Orlando, Florida 32819;

(l)  **Willie H. MURPHY**, B/M, DOB 10/14/1970, SSN 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, FBI# 803448JA3; addresses: 7601 Ferrara Avenue, Orlando, Florida, 32819 and 7720 Arezzo Steet, Orlando, Florida, 32819;

(m)  **Paul Demetrius SMITH**, B/M, DOB 04/10/76, SSN 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, FBI# none; address: 9570 Chandon Drive, Orlando, Florida 32825;

9

(n) **Gregory Bruce GALIN**, W/M, DOB 12/14/1962, SSN 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, FBI# 691654WA0; address: 5343 Emerald Isle Drive, Orlando, Florida 32812;

(o) **Jeffrey Wayne GREATHOUSE**, W/M, DOB 02/14/1976, SSN 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, FBI# 849208WB0; address: 13858 Country Place Drive, Orlando, Florida 32826;

(p) **James Rudolph CHILES**, B/M, DOB 08/27/1960, SSN 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, FBI# 828294T1; address: 2037 Buchanan Bay Circle, #108, Orlando, Florida 32839;

(q) **Aubrey BROWN**, B/M, DOB 10/14/1967, SSN 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, FBI# 814013EB7; former address: **5925 Danube Way, Orlando, Florida 32807**; presently incarcerated in the Volusia County Jail, inmate# 538189;

(r) **Sheldon Jerrod JOHNSON**, B/M, DOB 04/28/1969, SSN 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, FBI# 869462HA9; address: 7707 Ferrera Street, Orlando, Florida 32819;

(s) **Kristina Ann GUSE**, W/F, DOB 05/29/1979, SSN 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, FBI# none; address: **2307 S. Bumby Avenue, Apartment D, Orlando, Florida 32806**;

(t) **Courtney Nicole BRADLEY**, B/F, DOB 11/03/1980; SSN 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, FBI# 340492VB4; address: 4175 Song Drive, Cocoa, Florida 32927-8664;

(u) **Donea Evanella FUSON**, W/F, DOB 05/28/1975, SSN 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, FBI# 370575XA6; address: 2303 S. Bumby Avenue, Apartment C, Orlando, Florida 32806; and

(v) **Erica Renee RAMIREZ**, W/F, DOB 09/23/1982, SSN 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, FBI# none; address: 12001 Royal Wulff Lane, #1035, Orlando, Florida 32817.

## PREMISES FOR SEARCH WARRANTS

10

11.    Additionally, based upon the facts and circumstances as noted below, there is probable cause to believe that items related to the distribution, storage, or manufacture of controlled substances and the laundering, expenditure or storage of drug proceeds (more particularly described in ATTACHMENT B of this affidavit) are presently located in the premises identified below:

(1) **5925 Danube Way, Orlando, Florida 32807** (residence of **Bobby Louis BELLAMY**);

(2) **2307 S. Bumby Avenue, Apartment D, Orlando, Florida 32806** (Country Place Apartments; residence of **Kristina Ann GUSE**);

(3) **4816 Manduria Street, Orlando, Florida 32819** (residence of **Joe Nathel BELLAMY**);

(4) **7611 Ferrara Avenue, Orlando, Florida 32819** (residence of Inez Payne; associated with **Bobby BELLAMY**);

(5) **12642 Old Castle Drive, Orlando, Florida 32837** (residence of **Patrick PERRY**);

(6) **2152 Oak Ridge Road, Apartment C, Orlando, Florida 32809** (Pinehurst Apartments; associated with **Patrick PERRY**);

(7) **2401 Cancun Court, Kissimmee, Florida** (residence of Delroy Chambers; associated with **Ray ABLE**);

(8) **548 Bamboo Harbor Court, Apartment #205, Orlando, Florida** (The Woodlands Apartments; residence of **Ainsworth E. BROWN**);

11

(9) **5048 Eastwinds Drive, Orlando, Florida 32819** (residence of **Jerry Vega ORTIZ**);

(10) **4926 Vanguard Street, Orlando, Florida 32819** (residence of Ricky L. James); and

(11) **7620 Ravenna Avenue, Orlando, Florida 32819** (residence of Donald L. Wilcox).

## OVERVIEW OF INVESTIGATION

12.        Based upon law enforcement activity and intelligence, affiant knows that the Tangelo Park neighborhood has been a high volume drug dealing area in Orange County, Florida, for many years. Tangelo Park is a neighborhood located off of Sand Lake Road, between Kirkman Road to the west and John Young Parkway to the east. Tangelo Park is on the north side of Sand Lake Road. The neighborhood can only be accessed by two main entrances/exits. Drug dealers operating within Tangelo Park are known by law enforcement officers to utilize "lookouts" and "runners" to facilitate their drug trafficking activities. "Lookouts" are employed to watch for the police and to warn the drug dealers operating within the neighborhood. "Runners" are employed by various street-level drug trafficking organizations to transport drugs from stash or storage locations to locations within the neighborhood that are used to sell the drugs to various customers. Law enforcement officers who have patrolled the area known as Tangelo Park also report a significant level of street-level violence that can be attributed to drug dealers and other criminals who conduct their activity within the neighborhood. This investigation has identified **Bobby Louis BELLAMY** as a trafficker of cocaine HCL, crack cocaine, ecstasy,

12

and other narcotics who supplies numerous drug trafficking associates residing in and operating within the Tangelo Park area. As noted below, the **Bobby BELLAMY** drug-trafficking organization has employed the use of "lookouts" and "runners" to aid in the distribution of narcotics, in an attempt to conceal the organization's illegal activities.

13.        On January 10, 2000, MBI and DEA Agents arrested Isaac Lane (a/k/a "Ike") in a reverse undercover operation. Lane was attempting to purchase a quarter-kilogram of crack cocaine and one kilogram of cocaine HCL. In relation to the attempted purchase of the cocaine, Lane provided an undercover agent with $8,060.00 cash, several pieces of jewelry and a ballistic, bullet-proof vest as payment. During this investigation, agents determined that Lane resided in the Tangelo Park area of Orange County, Florida. Subsequent to Lane's arrest and a waiver of his Miranda Warnings, Lane implicated **Bobby BELLAMY** and **Patrick PERRY** in the plan to purchase the powder cocaine. Lane stated that they (referring to **PERRY** and **Bobby BELLAMY**) knew how to cook cocaine powder into crack cocaine and that they wanted to buy cocaine powder. Lane stated that earlier in the day, **PERRY** and **Bobby BELLAMY** had provided him with money to purchase three-quarters (3/4) of a kilogram of cocaine. Lane stated that **PERRY** gave Lane $3,000 cash and **Bobby BELLAMY** gave Lane $5,000 cash to facilitate Lane's effort to acquire the cocaine. Lane stated that he was supposed to call **PERRY** at **PERRY**'s cellular telephone number, 407-340-3706, to let **PERRY** know when Lane had the cocaine. Lane further stated that he was also supposed to call **Bobby BELLAMY** at **Bobby BELLAMY**'s cellular telephone number, 407-595-2571, to let **Bobby BELLAMY** know that

13

Bobby BELLAMY's portion of the cocaine was ready. According to Lane, **PERRY** was supposed to receive 1/8 kilogram of cocaine and **Bobby BELLAMY** was supposed to receive 1/4 kilogram of cocaine; both **PERRY** and **Bobby BELLAMY** intended to convert the powder cocaine into crack cocaine. Lane stated that the rest of the powder cocaine was for him and he was going to pay someone to convert the powder into crack cocaine. During the interview of Lane, MBI Agent James McGriff (acting in an undercover capacity) began receiving telephone calls on Lane's cellular telephone from 407-340-3706 (**PERRY**'s cellular telephone number during this period of time). The person on the other end of the line identified himself as "Pat", and indicated that he wanted to know if Lane was okay and whether Lane was able to get his "package". Continuing in the interview, Lane stated that he usually obtained his crack cocaine from "Tony Ricks" by contacting Ricks via pager. "Tony Ricks" in this matter has been fully identified as Anthony Julius Ricks. The investigation being conducted of **Bobby BELLAMY** and associates has established that Ricks and **Bobby BELLAMY** are associates of one another.

14.    According to Orlando Police Department reports, the following occurred:

(a)  On April 15, 2000, at approximately 8:55 p.m., police officers went to **Bobby BELLAMY**'s residence located at 1683 Watauga Avenue, #102, Orlando, Florida, in reference to a home invasion/robbery. Upon arrival, **Bobby BELLAMY** informed officers that he and a friend were robbed at gunpoint by two black males. Based upon facts, circumstances, and evidence gathered during this investigation, I believe that the two suspects were knowledgeable of **Bobby BELLAMY**'s drug trafficking activities and were

14

attempting to steal **Bobby BELLAMY**'s drugs or drug proceeds from inside his apartment on this occasion;  (b)  On June 21, 2000, at approximately 3:19 a.m., police officers responded to **Bobby BELLAMY**'s residence located at 1683 Watauga Avenue, #102, Orlando, Florida, in reference to a home invasion/robbery. Upon arrival, **Bobby BELLAMY** informed officers that he and a friend were robbed at gunpoint by two black males.  Based upon facts, circumstances, and evidence gathered during this investigation, I believe that the two suspects were knowledgeable of **Bobby BELLAMY**'s drug trafficking activities and were attempting to steal **Bobby BELLAMY**'s drugs or drug proceeds from inside his apartment on this occasion;  (c)  On June 14, 2001, at approximately 11:04 p.m., police officers went to the 5900 block of Appian Way, Orlando, Florida, in reference to a prowler call.  Upon their arrival, Orlando police officers encountered three black males after they had departed from **Bobby BELLAMY**'s residence located at **5925 Danube Way, Orlando, Florida** (by this time, **Bobby BELLAMY** had moved to the Danube Way residence from the Watauga Avenue residence as noted above).  After the three suspects jumped a fence from **Bobby BELLAMY**'s residence, they fled the area after dropping several items.  Two of the three suspects were later captured and a closer examination of the items the suspects dropped revealed the following items:  (1)  a yellow pillow case containing $24,764.83 in cash and a .45 caliber HiPoint semiautomatic firearm which was fully loaded; (2) a dark colored pillow case containing a Ruger Bearcat .22 caliber revolver, fully loaded, a Kaltec Smith & Wesson .40 caliber semiautomatic handgun, fully loaded, and the front end of what appeared to be a Cobrey Tech 9, along with an empty silver magazine,

15

unknown caliber; and (3) a gray safe.  At the same time, Candice L. Payne, **Bobby BELLAMY'S** sister, called 9-1-1 to report a residential burglary at **5925 Danube Way, Orlando, Florida**.  Payne stated that she had encountered the three suspects inside the residence, then watched the suspects run from the residence with objects in their hands.  Officers subsequently contacted  **Bobby BELLAMY**, who stated that he was the homeowner.  **Bobby BELLAMY** stated that several items had been stolen from his residence, including his life savings from working for a lawn company and breeding and selling dogs.  **Bobby BELLAMY** claimed ownership of the safe, and the large sum of money. **Bobby BELLAMY** further stated that a jar containing miscellaneous men's jewelry, with a value of over $10,000, had been taken from his bureau.  While conducting the investigation at **Bobby BELLAMY**'s house (victim), police officers located quantities of suspected marijuana. A K-9 subsequently alerted to the presence of controlled substances on the bag containing the cash and on the safe.  Based upon these circumstances, officers applied for and obtained a search warrant for **Bobby BELLAMY**'s residence; (d) On June 15, 2001, Orlando police executed the above-referenced search warrant at **5925 Danube Way, Orlando, Florida**.  Officers seized various items with cocaine residue including a Pyrex dish, spoons, ziplock bags, and a microwave oven, along with a small amount of marijuana and money.  An electronic scale, rubber bands, and three boxes of baking soda were also seized.  All these items are consistent with the packaging, manufacturing, and distribution of powder and crack cocaine.  Based upon the evidence seized in this matter, **Bobby BELLAMY** and Candice Payne were arrested for various drug-related offenses.

16

During the follow-up investigation, Candice Payne told police officers that she resided at **7611 Ferrara Avenue, Orlando, Florida** and provided an associated telephone number of (407) 351-2206; this residence is located within the Tangelo Park area of Orange County, Florida. During the intercepted telephone communications as noted below, **Bobby BELLAMY** identified Candice Payne as his sister. Information obtained from the Clerk of the Circuit Court in Orange County, Florida reflects that **Bobby BELLAMY** was originally charged with Armed Cocaine Trafficking but convicted of lesser included offenses relating to the Possession of Cocaine. On May 10, 2002, **BELLAMY** was sentenced to two (2) days jail, credit for time served, and placed on state probation for twenty-four (24) months.

15.    On May 2, 2001, the Orange County Sheriff's Office arrested Gilles Brummitt in relation to the seizure of approximately ten ounces of cocaine HCL. Subsequent to his arrest, Brummitt has provided information to law enforcement officials pertaining to the drug trafficking activities of **Bobby BELLAMY** and others. Brummitt has cooperated with law enforcement authorities in exchange for judicial consideration in his pending state drug case in Orange County, Florida. Beginning in October 2001, Brummitt began cooperating with Detective Matthew Floeter. Detective Floeter has been employed by the Orlando Police Department for fourteen years and had previously been assigned to the Drug Enforcement Administration, Orlando District Office, Task Force group for approximately three years. Brummitt has provided information to Detective Floeter in the past directly resulting in the arrest of at least three persons for drug-trafficking offenses. Thus, the information received from Brummitt is deemed accurate. Detective Floeter has utilized Brummitt, in regard to the initiation and subsequent development of the **Bobby**

17

**BELLAMY** investigation.    In the past, Brummitt provided intelligence information to Detective Floeter and other members of the Orlando Police Department.  However, during the past two week period, assigned task-force personnel and I have learned that Brummitt has continued to be involved in the distribution of crack and cocaine powder in the Tangelo Park area, in relation to **Bobby BELLAMY** and other members of the drug trafficking organization under investigation.  During the wire intercepts as partially noted below, Brummitt has been intercepted during telephone conversations with **BELLAMY**.  On or about August 7, 2002, the Orlando Police discontinued the utilization of Brummitt in relation to this investigation.  Notwithstanding, the information provided by Brummitt in the past has been independently corroborated through this investigation, and prior police activity involving **Bobby BELLAMY** and his associates. Detective Floeter has advised of the following:  Brummitt has told Detective Floeter that Brummitt had sold cocaine on behalf of **Bobby BELLAMY** for approximately three (3) months prior to his arrest, as referenced above.  Brummitt related that the ten ounces of cocaine that Brummitt was arrested with belonged to **Bobby BELLAMY**.  Based upon this relationship, Brummitt has learned that **Bobby BELLAMY** is a significant source of supply for powder and crack cocaine being supplied to numerous individuals throughout Orange County, Florida.  Brummitt also knows **BELLAMY** to be involved in the distribution of ecstasy and assorted prescription drugs. According to Brummitt, **Bobby BELLAMY** obtains up to five kilograms of powder cocaine per week.  Thereafter, **Bobby BELLAMY** and associates convert most of the powder cocaine into crack cocaine for distribution in the Tangelo Park area and elsewhere.

18

According to Brummitt, **Bobby BELLAMY** distributes cocaine from his residence located at **5925 Danube Way, Orlando, FL**, along with several subordinate members of his organization. Some of the individuals who presently assist **Bobby BELLAMY** in the distribution of cocaine or the collection of drug-related proceeds, or have assisted **BELLAMY** in the past, as known to Brummitt, are **Joe BELLAMY, Patrick PERRY**, Shelby Miller, **Kristina GUSE**, Brian Guse, Inez Payne, Kendall Furlow, Terrance Jones, **Albert HOPKINS, Wille H. MURPHY**, and individuals known to Brummitt as "A.J." and "Slaprock" or "Slap" (respectively identified as **Aubrey BROWN** and **Sheldon JOHNSON**, as noted below). Brummitt identified Inez Payne as **Bobby BELLAMY**'s mother and **Joe BELLAMY** as **Bobby BELLAMY**'s brother. Reportedly, Payne assists **Bobby BELLAMY** in the storage of drug proceeds at her Tangelo Park residence located at **7611 Ferrara Avenue, Orlando, Florida**. According to Brummitt, **Joe BELLAMY** assists his brother in the storage and distribution of powder and crack cocaine from his Tangelo Park residence located at **4816 Manduria Street, Orlando, Florida**. Also, Brummitt knows **Kristina GUSE** to be the girlfriend of **Bobby BELLAMY**, and indicated that **GUSE** resides at an apartment in the Conway area of Orlando, Florida. According to Brummitt, **Bobby BELLAMY** presently uses his cellular telephone and other telephone facilities to communicate with drug-related associates and to facilitate his drug-trafficking activities. Brummitt has provided a cellular telephone number of 407-595-2571 for **Bobby BELLAMY**, and further stated that **Bobby BELLAMY** uses this telephone to contact his source or sources of supply, in addition to **Bobby BELLAMY**'s numerous cocaine

19

customers.    Brummitt has provided cellular telephone numbers of (407) 376-1848 for

**PERRY**, (407) 595-5520 for **Joe BELLAMY**, and (407) 808-1127 for **HOPKINS**. Brummitt

stated that **PERRY, Joe BELLAMY**, and **HOPKINS**, respectively, use their cellular

telephones to communicate with **Bobby BELLAMY** and other drug traffickers, in order to

facilitate their drug distribution efforts.  According to Brummitt, **PERRY** and Miller regularly

obtained quarter and half-kilogram quantities of powder cocaine weekly from **Bobby**

**BELLAMY** since at least January, 2002, and would subsequently convert the powder into

crack cocaine for distribution (as discussed below, Miller was arrested on April 16, 2002

in relation to the seizure of approximately ½ kilogram of powder cocaine and approximately

40 grams of crack cocaine; Miller's arrest was partially based upon information provided

to Detective Floeter by Brummitt).  Shelby Miller is charged federally in Case No. 6:02-Cr-

42-Orl-19JGG. Brummitt stated that **HOPKINS** has  obtained multiple-ounce quantities of

cocaine once or twice a week  from **Bobby BELLAMY** since at least February or March,

2002.  During the last six months, Brummitt has observed kilogram quantities of cocaine

on a weekly basis inside **Bobby BELLAMY**'s residence, along with handguns, money, and

items used by **Bobby BELLAMY** and others in the packaging and sale of cocaine to

include plastic or ziplock bags, rubber bands, glass containers, and scales.  On or about

July 8, 2002, Brummitt observed approximately one kilogram of powder cocaine inside

**Bobby BELLAMY**'s residence located on Danube Way.  Brummitt stated that **Bobby**

**BELLAMY** utilizes surveillance cameras and maintains several pit bull dogs, in addition to

personally carrying handguns inside the residence to protect his interest in the drugs and

money being stored at the residence and in order to prevent future home invasions by rival drug traffickers. Brummitt has told law enforcement that **Bobby BELLAMY** receives approximately 1-2 kilograms of cocaine every 2-3 days at his residence on Danube Way. Further, Brummitt identified one of **Bobby BELLAMY**'s sources of supply as an unknown Haitian or Jamaican male and female who regularly deliver cocaine to **Bobby BELLAMY** at his residence. Brummitt explained that this unknown male and female operate together and are part of the same criminal organization. Brummitt has told Detective Floeter that **BELLAMY** has more than one cocaine source of supply, and identified another source as a Jamaican National known only to Brummitt as "Patrick" (investigation relative to "Patrick" by your Affiant and others has fully identified "Patrick" as **Patrick Anthony HUGHES**, a/k/a Harry McLeod, as noted below). Brummitt related that "Patrick" operates a white or light in color automobile.

16.    On December 7, 2001, investigation conducted by the Metropolitan Bureau of Investigation (MBI) culminated in the arrest of **Patrick PERRY** and another individual in relation to the seizure of 205 grams of crack cocaine, 44 grams of powder cocaine, a Glock 9mm semi-automatic pistol, and $5,881 cash. These charges were dismissed by the State Attorney's Office in the Ninth Judicial Circuit on or about July 12, 2002.

17.    On December 14, 2001, a traffic stop in Jasper County, South Carolina resulted in the arrest of a person hereafter referred to as CS-1. CS-1 and a second individual were arrested in relation to the seizure of approximately 2 ½ ounces of powder cocaine. Subsequent to the arrest of CS-1, CS-1 has provided information to law

21

enforcement officials pertaining to the drug trafficking activities of **Bobby BELLAMY**, also known to CS-1 as "Big Booty", and others. CS-1 is cooperating with law enforcement authorities in exchange for judicial consideration in the pending state drug case in South Carolina.

17.            Your Affiant and other agents have interviewed CS-1. The information provided by CS-1 in this regard has been independently corroborated through this investigation and prior police activity involving **Bobby BELLAMY** and associates. Thus, the information received from CS-1 is deemed reliable. CS-1 has known **Bobby BELLAMY** for more than five years and stated that **Bobby BELLAMY** presently resides behind a Winn Dixie grocery store near Stone Wall Jackson and Semoran Boulevard in Orlando, FL. CS-1 provided specific directions to **Bobby BELLAMY**'s residence which are consistent with the residence located at **5925 Danube Way, Orlando, Florida**. According to CS-1, **Bobby BELLAMY** owns multiple vehicles and several pit bull dogs. CS-1 provided a cellular telephone number of 407-595-2571 for **Bobby BELLAMY**. According to CS-1, CS-1 obtained 3-4 ounces of powder and crack cocaine per week from **Bobby BELLAMY** during the nine week period before CS-1's arrest on December 14, 2001. On one occasion during 2001, CS-1 obtained approximately 9 ounces of powder cocaine from **Bobby BELLAMY**. In total, CS-1 estimated that CS-1 has purchased approximately 34 ounces of powder and crack cocaine from **Bobby BELLAMY**. CS-1 further stated that CS-1 paid from $700 to $900 per ounce for both powder and crack cocaine and that CS-1 paid **Bobby BELLAMY** for the cocaine in full at the time of the delivery. CS-1 stated that

22

during the referenced nine week period (October - December 2001), most of the cocaine transactions occurred at **Bobby BELLAMY**'s residence and that CS-1 had observed money, scales, and three handguns in the residence or on **Bobby BELLAMY**'s person during the drug transactions. CS-1 further stated that after many of these transactions, **Bobby BELLAMY** walked CS-1 to the front door of **Bobby BELLAMY**'s residence while **Bobby BELLAMY** had a gun in his hand. According to CS-1, **Bobby BELLAMY** has a Glock 9mm semiautomatic pistol, a Ruger semiautomatic pistol, and a third unknown handgun. On most occasions CS-1 purchased powder and crack cocaine from **Bobby BELLAMY** from within **Bobby BELLAMY**'s residence and CS-1 observed additional quantities of cocaine. In this regard, CS-1 has observed one to two kilograms of powder and crack cocaine inside **Bobby BELLAMY**'s residence. On some occasions during this time period, CS-1 related that CS-1 obtained multiple ounce quantities of powder and crack cocaine from **Bobby BELLAMY** in the front yard of Inez Payne's house in Tangelo Park, located at **7611 Ferrara Avenue, Orlando, Florida.** CS-1 does not know whether Payne was present in the house during those transactions. CS-1 stated that **Bobby BELLAMY** distributes both powder and crack cocaine and is responsible for supplying drugs to the Tangelo Park area near Orlando, Florida. In order to arrange the purchase of the cocaine from **Bobby BELLAMY**, CS-1 stated that he/she has contacted **Bobby BELLAMY** at 407-595-2571 in the past. According to CS-1, **Bobby BELLAMY** has sometimes referred to powder cocaine as "dirty laundry"or "soft" and crack cocaine as "clean laundry"or "hard", when discussing pending drug transactions on the telephone. CS-1 told agents that

23

**Bobby BELLAMY** normally engages in brief telephone conversations when discussing drugs. For example, CS-1 stated that **Bobby BELLAMY** might indicate the availability of drugs simply by stating, "come on over" or "I'm ready". CS-1 has observed **Bobby BELLAMY** distribute quantities of powder and crack cocaine to William Lane, Issac Lane (a/k/a "Ike"), and "Patrick" LNU (last name unknown). CS-1 stated that "Patrick" uses a nickname of "Bird" and that he was arrested during the first or second week of December 2001 for a cocaine-related charge. CS-1 has identified a copy of a Florida Driver's License photograph of **Patrick PERRY** as the individual he knows as "Patrick" or "Bird" (hereafter referred to as **PERRY**). CS-1 related that CS-1 has personally visited **PERRY** at **PERRY**'s residence located within the South Chase area of Orange County, Florida and has observed up to ten ounces of crack cocaine inside **PERRY**'s residence on a single occasion prior to 2002. CS-1 has provided a specific address of **12642 Old Castle Road, Orlando, FL** for **PERRY**. CS-1 further stated that CS-1 had purchased cocaine powder and crack cocaine from **PERRY** on numerous occasions, during 2001; many of these cocaine purchases occurred from within **PERRY**'s residence located at **12642 Old Castle Road**. CS-1 obtained approximately three ounces of powder cocaine from **Bobby BELLAMY** the day before CS-1's arrest in South Carolina. CS-1 stated that the 2 ½ ounces of cocaine CS-1 was arrested with was the remainder of the cocaine that he had obtained from **Bobby BELLAMY**. In addition to the above, CS-1 has purchased Oxycontin from **Bobby BELLAMY** for $20 to $40 per pill. CS-1 reported that in addition to Oxycontin, **Bobby BELLAMY** is involved in the distribution of Ecstasy, Darvocet, Xanax,

Hydrocodone, and other prescription drugs. CS-1 identified **Bobby BELLAMY's** girlfriend, **Kristina GUSE**, and **Bobby BELLAMY's** brother, known to CS-1 as "J.B.", as being involved in the cocaine trafficking activities of **Bobby BELLAMY**. CS-1 has identified a copy of a Florida Driver's License photograph of **Joe BELLAMY (Bobby BELLAMY'S** brother) as the individual CS-1 knows as "J.B.". CS-1 has recently learned that **GUSE** is residing at an apartment in the Conway area of Orlando, Florida. Investigation by task-force agents and I has determined that **GUSE** presently resides at **2307 S. Bumby Avenue, Apartment D, Orlando, FL**. The apartment complex, known as The Country Place Apartments, is located in the Conway area of Orlando.

18.        On January 28, 2002, Orlando police officers conducted surveillance at **5925 Danube Way, Orlando, Florida (Bobby BELLAMY's** residence). At approximately 1:25 p.m., officers observed a male later identified as **Hughon Everdell BROWN** and an unknown female arrive at the residence in a blue Dodge mini-van bearing Florida license tag J13-61V, a vehicle registered to Alamo Rental Car. Records obtained from Alamo Rental Car reveal this vehicle was rented by Anthony Meah who listed an address of 38 Elmborne Road, London (England) and provided two associated telephone numbers of (207) 813-0004 and (407) 928-4291. During the surveillance, a male known only to agents as "Lavell", met **Hughon BROWN** at the Dodge mini-van then walked toward the front of the residence. Surveillance was unable to determine if "Lavell" entered the residence or met with someone in front of the residence during this period. Shortly thereafter, "Lavell" returned to the mini-van, carrying a white plastic bag, and provided the bag to **Hughon**

25

BROWN. Next, **Hughon BROWN** and the unknown female departed the Danube Way residence in the mini-van and were followed to the Caribbean Bakery, located at the intersection of John Young Parkway and W. Colonial Drive, Orlando, Florida. Surveillance was subsequently discontinued on **Hughon BROWN** and the female.

19.         Following the surveillance conducted on January 28, 2002 involving **5925 Danube Way**, "Lavell", **Hughon BROWN** and the unknown female in the Dodge mini-van, Gilles Brummitt informed Detective Floeter that money was contained within the bag that "Lavell" provided to the occupants of the mini-van. Brummitt stated that the mini-van was occupied by the unknown male (referring to **Hughon BROWN**) and female that Brummitt believes to be one of the sources of cocaine to **Bobby BELLAMY**. According to Brummitt, the money was provided to the male and female by "Lavell", on behalf of **Bobby BELLAMY**, to purchase at least one kilogram of cocaine. Also, Brummitt stated that the male and female returned to **Bobby BELLAMY**'s residence later during the evening of January 28, 2002, for the purpose of delivering one kilogram of cocaine to **Bobby BELLAMY**. Surveillance activity at **Bobby BELLAMY**'s residence on this date had been concluded at approximately 2:28 p.m.

20.         On January 31, 2002, Orlando detectives met with Brummitt, who advised that **Bobby BELLAMY** had contacted Brummitt earlier in the day and requested that Brummitt come to **Bobby BELLAMY**'s residence to obtain a quantity of cocaine. On this same date, at approximately 12:00 p.m., a brief telephone call from **Bobby BELLAMY** to Brummitt was recorded by law enforcement wherein **Bobby BELLAMY** told Brummitt that

the crack cocaine was ready to be picked up. During this call, **Bobby BELLAMY** informed Brummitt that **Bobby BELLAMY** had received cocaine from a source of supply on January 31, 2002, at approximately 12:30 a.m. During the meeting with Brummitt, Detectives Floeter and Hayden searched Brummitt for drugs and money; this search was negative. Brummitt was not equipped with a transmitting or recording device based upon concerns for Brummitt's personal safety. Thereafter, detectives observed Brummitt enter **5925 Danube Way**. Prior to Brummitt's arrival, Detective Floeter had instructed Brummitt to obtain three ounces of crack cocaine from **Bobby BELLAMY**. Upon Brummitt's arrival inside the residence, Brummitt met with **Bobby BELLAMY** and "Lavell". According to Brummitt, Brummitt then received approximately four crack cocaine "cookies" from **Bobby BELLAMY**, along with approximately 29.3 grams of powder cocaine. At this time, **Bobby BELLAMY** instructed Brummitt to deliver the drugs to other persons, including Kendall Lamont Furlow, on behalf of **Bobby BELLAMY**. Next, Brummitt placed the crack and powder cocaine into a plastic video cassette case provided to Brummitt by "Lavell". Brummitt then departed from the residence. The surveillance activity, specifically noting "Lavell" providing the video cassette case to Brummitt, was videotaped by Detective Velez of the Orlando Police Department. Brummitt was continuously followed to a neutral location and met by Detectives Floeter and Hayden. At this time, Detective Floeter took custody of the drugs. The total weight of the four crack cocaine "cookies" was determined to be approximately 86.5 grams and the weight of the powder cocaine was determined to be approximately 29.3 grams. During the related interview of Brummitt, Brummitt stated

27

that three of the crack cocaine "cookies" were supposed to be delivered to Detective Floeter (acting in an undercover capacity). The three "cookies" were later processed as drug evidence by the Orlando Police Department, and subsequently turned over to the DEA drug laboratory in Miami, Florida for analysis. According to the DEA laboratory, the three cookies were determined to be "cocaine base" at a purity of 81%. The net weight of the "cocaine base", more commonly known as crack cocaine, was determined to be 60.2 grams.

21.     Based upon the above information obtained from Brummitt, who had been instructed by **Bobby BELLAMY** , Orlando Police Officers conducted an investigation on the same date culminating in the arrest of Kendall Furlow in relation to the seizure of approximately 11.3 grams of crack cocaine (Furlow is one of the individuals that **Bobby BELLAMY** instructed Brummitt to deliver drugs to as referenced above).

22.     Following the arrest of Furlow on January 31, 2002, detectives provided Brummitt with $2,540.00 cash to facilitate the purchase of the three ounces of crack cocaine delivered by Brummitt to U/C Floeter. Brummitt then spoke to **Bobby BELLAMY** on **BELLAMY's** cellular telephone; however, this conversation was not recorded. At that time, **Bobby BELLAMY** instructed Brummitt to return the money, along with a small quantity of undelivered powder and crack cocaine, to **Bobby BELLAMY's** "brother-in-law" at the **5925 Danube Way** residence. Orlando detectives then observed Brummitt return to the residence. Upon Brummitt's arrival inside **5925 Danube Way,** Brummitt turned the $2,540 cash and the drugs over to Brian Lee Guse. Brian Guse is the brother of **Bobby**

28

BELLAMY's girlfriend, **Kristina GUSE**. At approximately 5:42 p.m., surveillance and enforcement activity was concluded by the Orlando Police Department.

23.        On April 15, 2002, Orlando police officers conducted surveillance at **5925 Danube Way, Orlando, Florida**. During this surveillance, an unknown female arrived at the residence in a blue Town & Country mini-van bearing Florida license J95-60W, registered to Alamo Rent a Car. Records obtained from Alamo Rental Car reveal this vehicle was rented by Marcia Leach during this time period. The records further reveal that Leach indicated an address of 4103 Saddlewood Drive, Orlando, Florida and provided an associated telephone number of (407) 295-0575. The female, tentatively identified as Leach, exited the mini-van and entered the residence, carrying a large laundry-type bag. After a brief period of time, the female exited the residence with an unknown male, who was now carrying the same laundry-type bag. Next, the unknown male placed the bag into the female's vehicle and re-entered the residence. The female then departed **BELLAMY's** residence with the bag.

24.        Following the surveillance conducted on April 15, 2002 involving **5925 Danube Way** and the female in the Town & Country mini-van, Brummitt informed Detective Floeter that the female had delivered two kilograms of powder cocaine which was contained within the large laundry-type bag. Brummitt, however, could not identify the female. The unknown male thereafter carried the same bag to the female's car, which at that time, according to Brummitt, contained money.

25.        On April 16, 2002, Orlando police officers conducted surveillance at **5925**

29

**Danube Way, Orlando, Florida**. At approximately 3:45 p.m., Orlando detectives observed a blue Toyota Corolla bearing Florida license C1055650, registered to Anayanzi Carrington-Simpson. Detectives then observed Shelby Lamar Miller (front passenger) and Carrington-Simpson (driver) exit from the Corolla then enter **Bobby BELLAMY**'s residence. Miller entered the residence carrying a blue bag. During this period of time, Brummitt contacted Detective Floeter and advised that Miller was presently obtaining cocaine from **Bobby BELLAMY**. Shortly thereafter, Miller and Carrington-Simpson exited from **Bobby BELLAMY**'s residence and re-entered the Corolla, with Miller still in possession of the blue bag. Based upon the surveillance activity and previous information received from Brummitt relative to the delivery of two kilograms of cocaine to **Bobby BELLAMY** on April 15, 2002, and information specifically relating to Miller, detectives reasonably determined that Miller had obtained cocaine from within **Bobby BELLAMY**'s residence, utilizing the blue bag to carry and conceal the drugs.

26.        On April 16, 2002, at approximately 4:05 p.m., uniformed Orlando Police Officers T. Herb and N. Russell conducted a vehicle stop of the Corolla based upon the reasonable belief that criminal activity was occurring. After contacting Carrington-Simpson and Miller, Carrington-Simpson provided verbal consent to search the Corolla. In addition to a residual quantity of marijuana, Officers Herb and Russell located a plastic "Dumbo" video case and a blue bag on the passenger side floorboard, in the immediate area where Miller had been seated. Further examination of the blue bag resulted in the seizure of approximately one-half kilogram of powder cocaine from within, contained within a vacuum-sealed plastic bag. Examination of the "Dumbo" video case resulted in the seizure of two

crack cocaine "cookies" and a razor blade. In relation to the seizure of the powder and crack cocaine from the passenger side floorboard and the previous surveillance of Miller, Miller was arrested for Possession of Cocaine With Intent to Sell in violation of Florida State Statute 893.13. The two "cookies" and the half-kilogram of powder cocaine were later processed as drug evidence by the Orlando Police Department, and subsequently turned over to the DEA drug laboratory in Miami, Florida for analysis. According to the DEA laboratory, the two cookies were determined to be "cocaine base" at a purity of 82%. The net weight of the "cocaine base", more commonly known as crack cocaine, was determined to be 36.6 grams. The half-kilogram was determined to be "cocaine hydrochloride" at a purity of 70%. The net weight on the powder cocaine was determined to be 504.1 grams. A search of Miller incident to arrest revealed $1,268.00 cash located in Miller's left front pant's pocket. Also seized during Miller's arrest was a cellular telephone, (407) 222-8894. Miller later provided a post-Miranda statement to detectives, in which he acknowledged that the drugs belonged to him and that he intended to convert the half-kilogram of powder cocaine into crack. Miller identified **Bobby BELLAMY** as his cocaine source of supply and indicated that he had just received the cocaine from **Bobby BELLAMY** at **Bobby BELLAMY**'s house on Danube Way. Miller stated that he had used the blue bag to transport both money and drugs. Further, Miller explained that he provided $7,000.00 cash to **Bobby BELLAMY** inside the residence in order to partially pay for the half-kilogram, and that he (Miller) owed **Bobby BELLAMY** another $7,000.00 (total purchase price for the half-kilogram was $14,000). Miller related that he had obtained at least a quarter-kilogram of cocaine from **Bobby BELLAMY** each week, during the past 9

31

½ months.  Miller also acknowledged that he had utilized a cellular telephone with a number of (407) 222-8894 during the course of his cocaine trafficking activities with **Bobby BELLAMY**.  Additionally, toll analysis corroborates Miller contacted **Bobby BELLAMY** on **BELLAMY**'s cellular telephone, (407) 595-2571, on the day of Miller's arrest.

27.        At the time of Miller's arrest, he produced a Florida Driver's License in the name of James Relenza London with a date of birth of January 31, 1971.  Miller acknowledged that this was a fictitious document and that his real name was Miller.  NCIC records reveal Miller to have an extensive criminal history including numerous felony drug convictions from 1985 and continuing through April 16, 2002, in addition to other non-drug related charges.  On May 15, 2002, Miller was indicted by a Federal Grand Jury in Orlando, Florida, in Case No. 6:02-Cr-42-Orl-19JGG, and formally charged with (1) Possession with Intent to Distribute cocaine HCl and (2) Possession with Intent to Distribute cocaine base (note: the aforementioned state drug charges were dismissed in lieu of federal charges).

28.        On April 16, 2002, agents also observed the following: (a) **Patrick PERRY** arrived at **BELLAMY**'s residence, operating a black in color vehicle.  Upon exiting the vehicle, **PERRY** was observed to be talking on a cellular telephone as he entered **BELLAMY**'s residence; (b) **Albert Mosselors HOPKINS** arrived at **Bobby BELLAMY**'s residence operating a 2000 grey Toyota Tundra truck bearing Florida license F14-KGE.  Florida DHSMV records indicate that this vehicle is registered to Isabell Sims Montgomery or **Albert Mosselors HOPKINS** at 5131 Steyr Street, Orlando, Florida.  After several minutes, **HOPKINS** departed **Bobby BELLAMY**'s residence, accompanied by Brummitt,

32

and traveled to a location in Orlando, Florida where they met with Agent Floeter (acting in an undercover capacity).  At this time, **HOPKINS** provided a sample quantity of crack cocaine weighing 6.1 grams  to Brummitt, who then delivered same to Agent Floeter. Brummitt was acting under the direction of law enforcement on this occasion ; and (c) detectives observed a red Dodge Caravan bearing Florida license J22-15W, registered to Alamo Rent a Car,  arrive at **Bobby BELLAMY**'s residence.   Records obtained from Alamo indicate the vehicle was rented by Anthony Meah who listed an address of 38 Elmbourne Road, London (England),  and provided an associated telephone number of (407) 928-4291. Two occupants, later identified as **Hughon Everdell BROWN** and Farrah Kerri-Ann Stewart, arrived together in the Caravan.  **Hughon BROWN** exited the Caravan, carrying a gray and black backpack, met with **Bobby BELLAMY** in front of the residence, and then they entered the residence. Stewart remained in the Caravan. Shortly thereafter, **Hughon BROWN** exited the residence with the backpack  and re-entered the Caravan. After their departure , a traffic stop was conducted on the Caravan.  An examination of the gray and black backpack revealed approximately $3,000 - $4,000 cash.  At that time, **Hughon BROWN** provided a photo identification card in the name of Anthony Jorif Meah. The money, along with **Hughon BROWN** and Stewart, was photographed.   The money was not seized and Hughon Brown and Stewart were released.

29.        Following the surveillance conducted on April 16, 2002, involving **5925 Danube Way** and subjects **PERRY, HOPKINS, Hughon BROWN**  (a/k/a Anthony Jorif Meah) and Stewart, Brummitt informed Detective Floeter of the following: (1) during the

33

time in which **PERRY** was at the residence, **PERRY** obtained a half-kilogram of powder cocaine from **BELLAMY**; (2) during the time in which **Hughon BROWN** was at the residence, **Hughon BROWN** delivered two kilograms of cocaine to **Bobby BELLAMY**; and (3) the 6.1 grams of crack cocaine delivered to Agent Floeter had previously been provided to **HOPKINS** by **Bobby BELLAMY** inside **Bobby BELLAMY**'s residence.

30.        On May 6, 2002, at approximately 11:54 p.m., a traffic stop conducted by the Osceola County Sheriff's Office culminated in the arrest of **Hughon BROWN** and **Ainsworth BROWN** in relation to the seizure of more than one (1) kilogram of powder cocaine from a 2000 silver BMW model M3 bearing Florida license EK4-97U. Subsequently, **Ainsworth BROWN** was determined to be the owner of the BMW. During the stop, **Hughon BROWN** produced identification bearing the name "Anthony Meah". A portion of the powder cocaine was found in a gray and black backpack, similar to the backpack that Orlando detectives had observed **Hughon BROWN** carry into and from **Bobby BELLAMY**'s residence on the occasion as noted above. The other quantity of cocaine was found in a blue plastic "Wal-Mart" bag. This cocaine was further contained inside twenty-three finger-sized pellets. Your affiant knows through training and experience that drug smuggling organizations often utilize concealment techniques employing couriers who swallow or ingest small amounts of drugs contained within rubber, latex, wax, or other materials. These amounts of drugs, initially ingested then later excreted, are more commonly referred to as "pellets" or "fingers". Drug couriers swallow the "pellets" or "fingers" containing drugs in an effort to smuggle the drugs into the United States from

34

other countries, including Jamaica. The cocaine "pellets" or "fingers" seized from **Hughon BROWN** and **Ainsworth BROWN** in this matter are consistent with the packaging and smuggling methods utilized by other drug trafficking organizations. In relation to the arrest of **Hughon BROWN**, police officers seized a Motorola cellular telephone determined to be (407) 257-9663. A search of the cellular telephone incident to **Hughon BROWN's** arrest resulted in the discovery of several telephone numbers and associated names from the "electronic Rolodex" portion of the phone. Among the telephone numbers and names in **Hughon BROWN's** cellular phone was 407-595-2571 with an associated name entry of "Fat-Boy" (as noted throughout this affidavit, this number is the cellular telephone of **Bobby BELLAMY**).

31.     During this investigation, agents have determined that **Hughon Everdell BROWN** has utilized an alias name of Anthony Jorif Meah with an associated date of birth of October 20, 1971. According to NCIC records, **Hughon BROWN** has also utilized an alias name of Dejon Holder. **Hughon BROWN** was convicted of Possession With Intent to Deliver Cocaine on June 23, 1992, after being arrested in Newport, Rhode Island. On May 26, 1993, **Hughon BROWN** was convicted of Homicide/Willful Kill and sentenced to three (3) years and twenty-two (22) days in Florida State Prison. Additionally, **Hughon BROWN** has been arrested for a variety of other criminal charges which were subsequently dismissed, including Robbery with a Firearm, Kidnaping, Automobile Theft, and Grand Larceny.

32.     On May 22, 2002, United States Magistrate Judge James G. Glazebrook

35

signed an order authorizing the installation and use of a pen register and trap and trace device on the "Subject Telephone 1", (407) 595-2571, which were installed on or about May 29, 2002.

33.        During the evening of June 4, 2002, MBI Agent Will Englert directed a confidential source of information (hereafter referred to as CS-2) to telephone **Patrick PERRY** at cellular telephone number (407) 376-1848.   CS-2 is pending judicial proceedings in state court related to a drug-related arrest and is assisting law enforcement in exchange for judicial consideration. During the ensuing telephone conversation, **PERRY** and CS-2 discussed the aspects related to the sale of at least one ounce of crack cocaine from **PERRY** to CS-2.   CS-2 later met with **PERRY** at a location within Orange County, Florida and purchased approximately 33 grams of suspected crack cocaine in exchange for $1,000.00 pre-recorded investigative funds. This substance field tested positive for the presence of cocaine. On this occasion, MBI Agent James McGriff (acting in an undercover capacity) witnessed the drug transaction between CS-2 and **PERRY**.

34.        On June 5, 2002, at approximately 4:58 p.m., the DEA Orlando office recorded an outgoing telephone call from CS-1 to **Bobby BELLAMY**.  The call was placed to **Bobby BELLAMY** at telephone number (407) 595-2571.   The call was approximately 2 minutes and 8 seconds in duration.  The pertinent, drug-related portion of the telephone call is transcribed as follows:

(phone rings)

**Bobby BELLAMY**: Hello

36

CS-1:                    Hello, what are you doing?...

<non-drug related conversation>

CS-1:                    ...Ah, nothing man.  Hey, I just want to double check, can I come see you tomorrow?

Bobby BELLAMY:  Not on no green.

CS-1:                    No, on the...

Bobby BELLAMY:  ...Alright.

CS-1:                    ...On the wash shit.

Bobby BELLAMY:  Yeah.

CS-1:                    Like two of 'em.

Bobby BELLAMY:  Alright.

CS-1:                    Yeah, 'cause I hooked back up with that guy in Virginia and shit, so it might be like a regular thing...

Bobby BELLAMY:  Yeah, you just got to be careful though.  You stumbled down the road.  How you get fucked that last time?  You stumbled down the road, right?

CS-1:                    No man.  My girl smoking in the damn truck.  She just put... (voices overlapping)... she just put out, you know, that green shit. So...

Bobby BELLAMY:  Oh, the green shit, right.

CS-1:                    Right, exactly.  So that messed me all up.

Bobby BELLAMY:  And that, that's probable cause to search man.

37

CS-1:                Hell yeah, and it was all over.  Hey...

**Bobby BELLAMY:** And I bet you had the shit hid in the car.  You know how you're

supposed to... don't hide nothing in the car, never.  Always keep

that shit between your butt.

CS-1:                That's it.  That's it.  And I never, I just got too fucking comfortable

man, you know.  Driving down the road, you know, I'd been back

and forth...

**Bobby BELLAMY:** I know it be uncomfortable...

CS-1:                ...Like fifty times...

**Bobby BELLAMY:** ...But look at it here.  Have it sitting out when them dudes see

something don't look right.  Put it in your pants.  Yeah go ahead,

search my car.  They can't search you if you got ID.  Always

remember that.

CS-1:                I'll try.  Hey, um...

**Bobby BELLAMY:** They... (voices overlap)

<non-drug related conversation continues, then drug related conversation resumes>

CS-1:                Alright, alright.  Hey, what's the best time, just around afternoon

or...

**Bobby BELLAMY:** Um, just call me man.

CS-1:                Alright, 'cause...

**Bobby BELLAMY:** I'll be up around eleven o'clock tomorrow.

CS-1:                Alright, 'cause I'm gonna...

**Bobby BELLAMY**: Alright?

CS-1:                    ...well try to do it early 'cause I got my little boy.  I want to get back

up there and spend some time with him.

**Bobby BELLAMY**: Alright

CS-1:                    Alright buddy

**Bobby BELLAMY**: Alright

CS-1:                    Later                    <end of conversation>

35.        Based upon my training and experience and participation in this particular investigation, as confirmed by CS-1, I believe that **Bobby BELLAMY** and CS-1 discussed a future drug transaction, in code, during the above noted conversation.  CS-1 asked **Bobby BELLAMY** if CS-1 could come see **Bobby BELLAMY** on the following day (June 6, 2002) regarding the purchase of drugs, to which **Bobby BELLAMY** responded that "green", referring to marijuana, was not presently available.  CS-1 specified that CS-1 was interested in purchasing "the wash shit"... "like two of 'em", referring to two ounces of cocaine, to which **Bobby BELLAMY** replied "alright", indicating that the cocaine was available for purchase on the following day.  Thereafter, **Bobby BELLAMY** and CS-1 discussed various aspects of the South Carolina traffic stop that resulted in CS-1's arrest during December, 2001.  In this regard, **Bobby BELLAMY** noted his knowledge regarding how the police may develop "probable cause" to search a vehicle and tells CS-1 to never "hide nothing in the car", referring to illegal drugs.  Further, **Bobby BELLAMY** informed CS-1 that CS-1 should have hidden the cocaine on CS-1's person instead of the vehicle,

in that the police would have had to gather additional reason to search CS-1's person and that a search of the vehicle would have resulted in negative results. At the conclusion of the telephone conversation, **Bobby BELLAMY** told CS-1 that CS-1 should telephone **Bobby BELLAMY** the following afternoon to finalize arrangements regarding the purchase of the two ounces of cocaine.

36.      On June 6, 2002, at approximately 4:13 p.m., the DEA Orlando office recorded an outgoing telephone call from CS-1 to **Bobby BELLAMY**. The call was placed to **Bobby BELLAMY** at telephone number (407) 595-2571. The call was approximately 1 minute and 6 seconds in duration. During the telephone conversation, CS-1 advised **Bobby BELLAMY** that CS-1 was fifteen minutes away. **Bobby BELLAMY** inquired what CS-1 wanted, and CS-1 replied "two of 'em", referring to two ounces of crack cocaine. **Bobby BELLAMY** related to CS-1 that the cocaine was available and that the price would be no better than "eight fifty", referring to a price of $850 per ounce. **Bobby BELLAMY** also referred to the quality of the cocaine by stating "close to fish scale". CS-1 told **Bobby BELLAMY** that CS-1 wanted the cocaine "washed", referring to crack cocaine instead of powder cocaine. **Bobby BELLAMY** then instructed CS-1 to park at the Winn Dixie, down the street from **Bobby BELLAMY**'s residence, and to call **Bobby BELLAMY** from this location.

37.      After the above referenced telephone call, CS-1's person and vehicle were searched for drugs and money; this search was negative. C1-1 was not equipped with a transmitting or recording device based upon concerns for CS-1's personal safety.

40

At this time, I provided CS-1 with $1,700 pre-recorded investigative funds to complete the anticipated purchase of two ounces of crack cocaine from **Bobby BELLAMY**. Thereafter, agents continuously followed CS-1 to the Winn Dixie parking lot located at 4361 Danube Way, Orlando, Florida.

38.         At approximately 4:40 p.m., agents observed **Bobby BELLAMY** depart from his residence, on foot, along with a pit bull dog. At approximately 4:51 p.m., the telephone number (407) 595-2571, as evidenced by the pen register device as noted above, was used to contact CS-1 at (352) 207-1086. This call lasted for approximately 27 seconds. According to CS-1, **Bobby BELLAMY** advised CS-1 to travel to **Bobby BELLAMY**'s residence during this telephone call, in order to complete the pending drug deal.

39.         At approximately 4:58 p.m., CS-1 arrived at **Bobby BELLAMY**'s residence, **5925 Danube Way, Orlando, Florida**. Thereafter, **Bobby BELLAMY** returned to the residence and met with CS-1 in the front yard. During this period of time, surveillance agents observed an individual subsequently identified as **Sheldon JOHNSON** as **JOHNSON** washed at least nine pit bull dogs in the front yard of the residence. **Bobby BELLAMY** and CS-1 eventually entered **Bobby BELLAMY**'s residence. During this period of time, CS-1 provided **Bobby BELLAMY** with the $1,700 cash in exchange for two crack cocaine "cookies". CS-1 subsequently departed the residence and was continuously followed to another location. CS-1 was again searched for drugs and money; this search was negative except for the two crack cocaine "cookies". The two "cookies" were later

41

turned over to the DEA drug laboratory in Miami, Florida, for analysis. According to the DEA laboratory, the two cookies were determined to be "cocaine base" at a purity of 80%. The net weight of the "cocaine base", more commonly known as crack cocaine, was determined to be 38.0 grams.

40.        Following the purchase of the two crack cocaine "cookies" from **Bobby BELLAMY** on June 6, 2002, CS-1 told agents that two other cocaine customers had frequented **Bobby BELLAMY**'s residence while CS-1 was present. Surveillance agents had observed **Albert Mosselors HOPKINS**, accompanied by Gilles Brummitt, arrive at **Bobby BELLAMY**'s residence then depart shortly thereafter. According to CS-1, **HOPKINS** and Brummitt obtained four (4) ounces of crack cocaine from **Bobby BELLAMY** in exchange for a partial payment of $1,200. CS-1 further observed additional quantities of crack and powder cocaine, estimated by CS-1 to be at least a half-kilogram, inside **Bobby BELLAMY**'s residence on this occasion. Immediately following this incident, Brummitt contacted Detective Floeter and related his (Brummitt's) involvement in receiving the four(4) ounces of cocaine with **HOPKINS**. CS-1 and Brummitt, independent of one another, related that a portion of the four ounces of cocaine was to be transported to **Joe BELLAMY** for distribution in the Tangelo Park area.

41.        On June 20, 2002, DEA SA Russell Baer received intelligence information from MBI Agent Christine Gigicos. Agent Gigicos had recently received information from a confidential source of information (hereafter referred to as CS-3) concerning the cocaine trafficking activities of **Bobby BELLAMY** and associates. CS-3 has provided information

42

to Agent Gigicos and other MBI agents in exchange for judicial consideration of a family member who is incarcerated in the Florida Department of Corrections prison system. CS-3 does not have any pending criminal charges, does not wish to be identified, and is unwilling to testify about any of the following intelligence information. The information provided by CS-3 in this regard has been independently corroborated by information developed during this investigation or previously known to law enforcement officials. Agent Gigicos informed SA Baer of the following: CS-3 identified "A.J" and "Slap" (respectively identified as **Aubrey BROWN** and **Sheldon JOHNSON** in this investigation) as individuals involved with the **Bobby BELLAMY** cocaine trafficking organization. CS-3 identified **Bobby BELLAMY** as a drug trafficker involved in supplying cocaine and crack cocaine to numerous individuals in the Tangelo Park area of Orange County, Florida. Further, CS-3 stated that the individual who operates a red Ford Mustang bearing Florida license B597Y is also involved in the distribution of cocaine with **Bobby BELLAMY**, "A.J.", "Slap" and others. Florida Department of Safety and Motor Vehicle (DHSMV) records reveal the Mustang to be registered to **Joe Nathan BELLAMY** at **4816 Manduria Street, Orlando, Florida**. According to CS-3, people residing at or frequenting the following Tangelo Park residences are involved in the **Bobby BELLAMY** drug trafficking organization: (1) **7611 Ferrera Avenue** (known to be the residence of Inez Payne, the mother of **Bobby BELLAMY**); (2) 7707 Ferrara Avenue (suspected residence of **Sheldon JOHNSON**); (3) **4816 Manduria Street** (known to be the residence of **Joe BELLAMY**); and (4) 4804 Manduria Street (suspected residence of William Lane).

43

42.        On August 12, 2002, SA  Baer received intelligence information from Orange County Sheriff's Office Corporal Terry Tiwowarski.  Corporal Tiwowarski had recently received information from a confidential source of information (hereafter referred to as CS-4) concerning the cocaine trafficking activities of **Bobby BELLAMY** and associates.  CS-4 knows **Bobby BELLAMY** by the nickname "Booty".  CS-4 is providing information to Corporal Tiwowarski and other law enforcement agents in exchange for judicial consideration subsequent to a drug-related conviction in Florida state court.  The information provided by CS-4 in this regard has been independently corroborated by information developed during this investigation or previously known to law enforcement officials and is consistent with information received from other sources of information.  Corporal Tiwowarski informed SA Baer of the following:  CS-4 identified **Willie MURPHY,** "Boo Joo" (identified by Orange County agents as Donald L. Wilcox), Ricky L. James and others as individuals associated with the **Bobby BELLAMY** poly-drug trafficking organization.  CS-4 identified **Bobby BELLAMY** as a cocaine trafficker involved in supplying cocaine and crack cocaine to numerous individuals in the Tangelo Park area of Orange County, Florida.  According to CS-4, Ricky James resides at and distributes cocaine and crack cocaine from the premises located at **4926 Vanguard Street, Orlando, Florida 32819;**  this residence is located within Tangelo Park.  CS-4 also reported that James has cocaine readily available within this residence.  Within the past ten days, members of the Orange County Sheriff's Office participated in the controlled purchase of crack cocaine from Ricky James, within the **4926 Vanguard Street** residence, utilizing CS-

44

4 in this regard.    James has been identified as a black male with a date of birth of 02/27/1983. NCIC records reflect that James has a criminal history including arrests for non-drug related offenses. According to CS-4, "Boo Joo" (Donald Wilcox) resides at and distributes marijuana from the premises located at **7620 Ravenna Avenue, Orlando, Florida 32819**; this residence is located within Tangelo Park. CS-4 also reported that Wilcox has marijuana readily available and maintains an assorted variety of guns within this residence. Within the past ten days, members of the Orange County Sheriff's Office participated in the controlled purchase of marijuana from Wilcox, within the **7620 Ravenna Avenue** residence, utilizing CS-4 in this regard.    Wilcox has been identified as a black male with a date of birth of 09/14/1965. NCIC records reflect that Wilcox has an extensive criminal history including arrests involving Possession of Marijuana and Cocaine; Wilcox's most recent drug-related arrest occurred during May 1998. In addition to the above information, CS-4 has identified **Texas Arnell GOBERN** (who CS-4 knows as "Tex") as a drug trafficker involved in the distribution of multiple ounce quantities and up to kilogram quantities of cocaine. CS-4 told agents that **GOBERN** is associated with the premises located at 5125 Polaris Street, Orlando, Florida 32819; this residence is located within Tangelo Park. CS-4 related that **GOBERN** is also associated with or may reside at an apartment located within the Chowder Bay Apartment complex.

## WIRETAP INFORMATION AND RELATED ACTIVITY DEVELOPED SUBSEQUENT TO INITIATION OF ELECTRONIC SURVEILLANCE

43.        On July 22, 2002, United States District Court Judge John Antoon, II, Middle District of Florida,  authorized the interception of wire communications occurring

over cellular telephone (407) 595-2571, utilized by **Bobby Louis BELLAMY**. The affidavit in support of the intercept was prepared and presented to Judge Antoon by your affiant. On July 24, 2002, activation of the interception of wire communications over cellular telephone (407) 595-2571 was initiated. On July 25, 2002, at approximately 10:05 AM, the monitoring of wire communications over (407) 595-2571 commenced. To date, the oral communications of **Bobby BELLAMY** and others have established that **Bobby BELLAMY** and numerous others are involved in a poly-drug trafficking organization, responsible for the distribution of cocaine, ecstasy, marijuana, and other controlled substances or prescription medications. This investigation has further established that **Bobby BELLAMY** has been and is presently being supplied cocaine by a structured network of Jamaican Nationals. Based upon your Affiant's investigation thus far, some of **BELLAMY's** Jamaican cocaine suppliers have been identified as **Ray ABLE** (a/k/a Victor Fogo, a/k/a "Dred", a/k/a "D", a/k/a "Big J"), **Hughon Everdell BROWN** (a/k/a Anthony Jorif Meah); **Ainsworth E. BROWN** (a/k/a "MD"), **Toney DUNKLEY**, and **Patrick Anthony HUGHES** (a/k/a "Patrick", a/k/a Harry McLeod). To date, **BELLAMY's** supplier for ecstasy tablets has been identified as **Jerry Vega ORTIZ** (a/k/a "J"). Your affiant has reviewed telephone conversations involving **Bobby BELLAMY** and numerous others wherein they discuss aspects related to the conversion of powder cocaine into crack cocaine and the distribution of cocaine and ecstasy.. The oral communications of **Bobby BELLAMY** and others also depict **Bobby BELLAMY** and others as they discuss his (**BELLAMY's**) effort to acquire cocaine on a consignment ("front") basis and **BELLAMY's** continuing and ongoing efforts

46

.

to collect proceeds resulting from the sale of powder or crack cocaine to facilitate the purchase of additional quantities of cocaine. Also, subsequent to enforcement activity conducted by task-force members in this case, **Bobby BELLAMY** has discussed details relating to these matters with several other members involved in this ongoing, criminal conspiracy.

44.      The below referenced call summaries are a sample of intercepted conversations occurring to or from the cellular telephone utilized by **Bobby BELLAMY**, (407) 595-2571, during July 24, 2002, through August 9, 2002, and do not represent all of the evidence/pertinent calls intercepted during that time. The identification of voices as noted below partially derives from participant self-identification, telephone subscriber information, monitor familiarity, physical surveillance, enforcement activity culminating in arrests or law enforcement contact, other intelligence information, or a combination of these factors. The following is a summary of activity from July 24, 2002, through August 9, 2002:

| | |
|---|---|
| Total number of calls: | 3,559 |
| Total completed calls: | 3,156 |
| Total malfunction calls: | 3 |
| Total pertinent calls: | 563 |
| Total minimized calls: | 119 |
| Total calls greater than 2 minutes: | 166 |

45.      A summary of several pertinent, drug-related calls received are as follows. Your Affiant's interpretation of the below noted intercepted telephone calls is partially based on the following: (a) your Affiant's training and experience in conducting prior drug investigations; (b) your Affiant's specific knowledge regarding the organization under

47

investigation including the knowledge of code language utilized by **Bobby BELLAMY** and others when referring to controlled substances; (c) enforcement activity culminating in the seizure of controlled substances or U.S. currency; (d) and the overall context in which the telephone conversations occurred.

46.            On July 25, 2002, at approximately 1:24 P.m.., **Bobby BELLAMY** utilizing cellular telephone (407) 595-2571 (hereafter referred to as "Subject Telephone 1" ), placed an outgoing telephone call, call # 18, to telephone number (407) 484-9626. This telephone number is subscribed to **Gregory Bruce GALIN** and related investigation has enabled agents to determine the user of this telephone facility as **Gregory Bruce GALIN**. During the conversation, **Bobby BELLAMY** told **GALIN**, "Got something you like boy" and **GALIN** responded, "Alright". **GALIN** then asked, "You at home?". **Bobby BELLAMY** at this point told **GALIN**, "Got that white lady again" and **GALIN** asked "Yeah, Yeah, you at home?" **Bobby BELLAMY** replied "I'm heading home." **Bobby BELLAMY** and **GALIN** also discussed a ½ pound marijuana transaction later in the conversation. The conversation was later terminated. On July 25, 2002, at approximately 8:26 P.m.. , **Bobby BELLAMY** utilizing Subject Telephone 1, placed an outgoing telephone call, call # 114, to telephone number (407) 484-9626. During the conversation, **GALIN** asked **Bobby BELLAMY** if he could "Hold one of them" for him and **Bobby BELLAMY** replied "Alright." The call was later terminated. It is believed by your Affiant that during these above conversations, **Bobby BELLAMY** was telling **GALIN** that he had cocaine HCl available for distribution and **GALIN** asked **Bobby BELLAMY** to hold one ounce of cocaine for him (**GALIN**).

48

47.      On July 25, 2002, at approximately 1:53 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #26, to telephone number (321) 228-8355. This telephone number is subscribed to **Willie H. MURPHY** and related investigation has enabled agents to determine the user of this telephone facility as **Willie H. MURPHY**. The answering machine picked up the call and stated "This is Coop." **Bobby BELLAMY** left the following message on the answering machine: "Hey boy I got some fish scales. No shake, all block. Talking about hard white." The call was then terminated. It is believed by your Affiant that during this call, **Bobby BELLAMY** was attempting to contact **Willie H. MURPHY** to inform **MURPHY** that he (**BELLAMY**) had powder cocaine (fish scales) and crack cocaine (hard) available.

48.      On July 25, 2002, at approximately 2:03 p.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #29, from telephone number (917) 868-4145. The subscriber for this telephone number is Sheryl Amore Hairdressing, Brooklyn, New York, and related investigation has enabled agents to determine the user of this telephone facility as **Ray ABLE** AKA Victor Fogo, "Dred", "D", or "Big J". Investigation relative to **ABLE** has established that **ABLE** is one of the Jamaican Nationals currently supplying cocaine to **Bobby BELLAMY**. During the conversation, **ABLE** asked **Bobby BELLAMY** "So you'll have something for us, for me tonight, when I come tonight, when I. . . ." The call was later terminated. On July 25, 2002, at approximately 2:40 p.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #37, from telephone number (917) 868-4145.

49

During the conversation, **Bobby BELLAMY** talked to **ABLE** about **ABLE** delivering a "Thing in a bag". **ABLE** replied that he would come and later told **Bobby BELLAMY** that he (**ABLE**) would be coming with "something nice." **Bobby BELLAMY** later tells **ABLE** that he (**BELLAMY**) wants to make a "Hundred grand in six months." The call was later terminated. On July 25, 2002, at approximately 8:29 p.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #115, from telephone number (917) 868-4145. During the conversation, **ABLE** tells **Bobby BELLAMY** that he will be there (**Bobby BELLAMY**'s residence) in "one minute." At this time, surveillance observed a 1998 blue Lincoln Navigator with Florida licence T12-ICI pulling down the street toward **BELLAMY**'s residence and shortly thereafter, arrive at **5925 Danube Way, Orlando, Florida.** At this point, a black male subsequently identified as **Ray ABLE** exited the navigator and met with **Bobby BELLAMY** in front of the residence. **ABLE** was carrying a small bag dark in color with a shoulder strap. Both **BELLAMY** and **ABLE** then entered the residence together. Approximately fifteen minutes later, **ABLE** exited **Bobby BELLAMY's** residence carrying the dark in color small bag with a shoulder strap and entered the Lincoln Navigator. Surveillance followed **ABLE** directly to a residence located at **2401 Cancun Court, Kissimmee, Florida. ABLE** then entered the residence, although agents were unable to determine if **ABLE** carried the dark in color bag into the residence. Approximately five minutes later, **ABLE** departed in a vehicle along with another male in a second vehicle. Agents followed one of the vehicles to an apartment complex located off of Mclaren Circle, Kissimmee, Florida, which is known as a place frequented by drug

50

traffickers and where numerous persons have been arrested on various drug charges within the past six months. It is believed by your Affiant that based upon the conversations and surveillance, **ABLE** delivered an unknown quantity of cocaine to **Bobby BELLAMY** at the Danube Way residence on this occasion. Your Affiant further believes, based on other intercepted communications involving **Bobby BELLAMY** and others, that **ABLE** received partial monies from **Bobby BELLAMY** intended to facilitate the purchase of the cocaine. **ABLE** is believed to have departed from **Bobby BELLAMY**'s residence with those monies and surveillance observed **ABLE** travel directly to **2401 Cancun Court, Kissimmee, Florida**, whereupon **ABLE** entered this residence. Shortly after the meeting between **ABLE** and **Bobby BELLAMY**, Gilles Brummitt reported to Agent Floeter that **BELLAMY** had received two kilograms of cocaine from one of **BELLAMY**'s Jamaican cocaine sources. Investigation relative to **2401 Cancun Court, Kissimmee, Florida**, has verified this premises as the residence of Delroy Alphanso Chambers, a Jamaican National with a date of birth of February 24, 1963. According to NCIC records, Chambers has been arrested for the following drug-related offenses in the past: (1) Violation of Controlled Substance/Drug/Delivery & Cosmetic Act and Criminal Conspiracy. This arrest occurred during 1986 in Philadelphia, PA and the disposition is unreported; (2) Cocaine Possession. This arrest occurred during 1989 in Kissimmee, FL and the disposition is unknown; and (3) Marijuana Possession under 20 grams (misdemeanor). This arrest occurred during 1993 and the charges were nolle prossed.

49.    On July 25, 2002, at approximately 6:04P.m., **Bobby BELLAMY** utilizing

51

the Subject Telephone 1, received an incoming telephone call, call #74, from telephone number (321) 689-5267. The subscriber for this telephone number is unknown and the user of this telephone facility is known only as "William". During the call, William LNU informed **BELLAMY** that he (William) was waiting at a gas station near International Drive and Kirkman Road. **BELLAMY**, as overheard in the background, asked a second unknown male to make a "run" for **BELLAMY**. **BELLAMY** then told William LNU that **BELLAMY** would send a "boy in a blue truck". **BELLAMY** then told William LNU to "have the money ready so you can do a quick transaction". Based on this call and other intercepted communications, your Affiant believes that William LNU was involved in purchasing an unknown quantity of drugs from **BELLAMY**, who directed another unknown male to deliver the drugs to William at the gas station. Based on your Affiant's overall involvement in this case, your Affiant further believes that this type of drug transaction is generally indicative of the way **BELLAMY** has conducted drug transactions, in so far as using subordinate members of his organization to deliver drugs.

50.         On July 25, 2002, at approximately 6:52P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #90, from telephone number (352) 245-7489. The subscriber for this telephone number is Carlos Balsinde and the user of the telephone facility on this occasion is known only as "Jimmy". During this call, Jimmy LNU asked **BELLAMY**, "Can you get ahold of ninety beans by tomorrow?" **BELLAMY** confirmed the number ninety then replied, "yes". Jimmy LNU later in the call told **BELLAMY** that he had "the cash in hand" and could be at **BELLAMY**'s the following

day at approximately 5:30P.m.. **BELLAMY** said, "Alright". On July 26, 2002, at approximately 4:28P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #234, from telephone number (352) 245-7489. During the call, Jimmy LNU asked **BELLAMY** if **BELLAMY** had "got all that" for Jimmy LNU. **BELLAMY** told Jimmy LNU, "Put your order in now". Jimmy LNU replied, "The same thing I told you yesterday", then again told **BELLAMY** that he (Jimmy LNU) wanted "ninety beans" and a "quarter white". **BELLAMY** later tells Jimmy LNU to call back later. On July 27, 2002, at approximately 5:22P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #528, from telephone number (352) 245-7489. The subscriber for this telephone number is Carlos Balsinde, as noted above, and the user of the telephone facility on this occasion is known only as "Tammy". During this call, Tammy LNU told **BELLAMY** that she wanted "seventy", instead of "ninety". Tammy LNU told **BELLAMY** that she was presently in Ocala and would not drive to Orlando until **BELLAMY** had "them". **BELLAMY** told Tammy LNU that **BELLAMY** had not been able to get ahold of his (**BELLAMY**'s) boy and hoped that nothing had happened to him. On July 29, 2002, at approximately 7:04P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #939, from telephone number (352) 245-7489. During this call, **BELLAMY** told Jimmy LNU that Jimmy LNU made **BELLAMY** buy "all those things the other day" and didn't come get "them". Jimmy LNU told **BELLAMY** that he thought that **BELLAMY** could not get "them". **BELLAMY** replied, "Seventy beans" and Jimmy LNU responded, "Ninety beans". **BELLAMY** told Jimmy LNU

53

that Tammy LNU had called and changed the amount from "ninety beans" to "seventy beans". **BELLAMY** also told Jimmy that **BELLAMY** still had "them" and described "them" as "double stacked fishies". Jimmy LNU told **BELLAMY** that he would call later. On July 29, 2002, at approximately 7:50P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #953, from telephone number (352) 245-7489. During this call, Jimmy LNU told **BELLAMY** that the "guys with the loot" are out in the Ocala National Forest. Jimmy LNU later tells **BELLAMY** that Jimmy LNU will send the girls, identified by Jimmy LNU as "Tammy and Melissa", tomorrow at 1P.m.. Jimmy LNU tells **BELLAMY** that he has "seven-hundred" and **BELLAMY** told Jimmy LNU to call first. On the following day (07/30/2002), during the afternoon hours, surveillance agents observed two females arrive at **BELLAMY**'s residence, **5925 Danube Way**. One of the female's entered the residence, and after a short while later, departed the residence in a vehicle registered to an address located near Ocala, Florida. Based upon this series of telephone calls and the related surveillance, your Affiant believes that **BELLAMY** conducted an ecstasy transaction on July 30, 2002 involving Jimmy LNU, Tammy LNU, and Melissa LNU.

51.        On July 25, 2002, at approximately 8:43P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #127, from telephone number (407) 467-4904. The subscriber for this telephone number is Centex Homes, Attn: **Paul SMITH**, and the user of this telephone facility has been identified as **Paul Demitrius SMITH**. During the conversation, **SMITH** told **BELLAMY** that "they" were on the way.

54

**BELLAMY** told **SMITH** that **BELLAMY** was "dirty" and that **BELLAMY** didn't want "Paradise" at the house too long while **BELLAMY** was "dirty". **SMITH** offered to come get "Paradise" for **BELLAMY**. Based on this telephone call and other intercepted communications, your Affiant believes that **BELLAMY**'s reference to "dirty" is a reference to **BELLAMY** having illegal drugs at his residence. Agents have determined that "Paradise" is a two-year old infant child, resulting from the union of **BELLAMY** and **Kristina GUSE**.

52.      On July 25, 2002, at approximately 11:43P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #161, from telephone number (407) 415-1004. The subscriber for this telephone number is Misuk Pak and the user of this telephone facility is known only as "Chinaman". During the call, **BELLAMY** told Chinaman that **BELLAMY** had "a pretty big one cooked up" for Chinaman. Chinaman replied that he needed "two whole ones soft". **BELLAMY** initially told Chinaman that **BELLAMY** had "only one soft" on him and then stated that he (**BELLAMY**) did have "two". **BELLAMY** informed Chinaman that he (**BELLAMY**) had the other "one" at his brother's house. **BELLAMY** then requested Chinaman to come over and "park in the driveway". After Chinaman tells **BELLAMY** that he is hesitant to come over to **BELLAMY**'s mother's house, **BELLAMY** says, "It's fish scale white ... that dries quick. Hard white". At approximately 11:45P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #162, to residential telephone number (407) 370-0903. The subscriber for this telephone number is Michelle Lane at **4816 Manduria Street, Orlando,**

**Florida 32819** and the user of the telephone facility on this occasion was **Joe BELLAMY**. During the call, **Bobby BELLAMY** told **Joe BELLAMY** that he (**Bobby BELLAMY**) would send someone over to get "the ounce of soft" before **Joe BELLAMY** went to bed. **Bobby BELLAMY** told **Joe BELLAMY** to "put an extra eight-ball in the corner of the bag" because **Bobby BELLAMY** was "short" on the "bag" he had. **Joe BELLAMY** told Bobby **BELLAMY** that if he has "it", he will. At approximately 11:49P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #164, from telephone number (407) 595-5520. The subscriber for this telephone number is **Joe BELLAMY** and the user of this telephone facility has been identified as **Joe BELLAMY**. During this call, **Joe BELLAMY** asked **Bobby BELLAMY** if he (Bobby) wanted to give the dude "the whole sand ... talking about the dude want two whole sand". Based on this series of calls, your Affiant believes that **Bobby BELLAMY** discussed the sale of two ounces of powder cocaine to Chinaman on this occasion. **Bobby BELLAMY** indicated that he had one ounce of cocaine with him and the other ounce of cocaine was at his brother's house (reference to **Joe BELLAMY**'s residence located at **4816 Manduria Street, Orlando, Florida 32819**). **Bobby BELLAMY** also discussed the quality of the cocaine available for sale in using the term "fish scale white" and told Chinaman that the cocaine powder would convert quickly into crack cocaine. **Bobby BELLAMY** then called his brother **Joe BELLAMY** and told **Joe BELLAMY** that someone was on the way to pick up one ounce of cocaine that was presently contained within **Joe BELLAMY**'s residence located at **4816 Manduria Street, Orlando, Florida 32819**, for **Bobby BELLAMY** to sell. **Joe BELLAMY** told **Bobby**

56

**BELLAMY** that he (**Joe**) would put an extra "eight-ball" (approximately 3 grams of cocaine, an eighth of one ounce of cocaine) in the bag if **Joe BELLAMY** had any additional cocaine. **Joe BELLAMY** and **Bobby BELLAMY** also used the terms "two whole sand" when referring to two ounces of powder cocaine. Based upon another intercepted call between **Bobby BELLAMY** and Chinaman, call# 166, on 07/26/2002 at approximately 12:07AM, your Affiant further believes that a one ounce powder cocaine transaction was later consummated between **Bobby BELLAMY** and Chinaman at a Walmart store on Kirkman Road, near the Tangelo Park area.

53.    On July 26, 2002, at approximately 10:33 AM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #191, from telephone number (407) 277-9280. The subscriber for this telephone number is unknown. Investigation has identified the subscriber of (407) 277-9280 as a pay phone in Orlando, FL and the caller as a Jamaican known subsequently identified as **Patrick Anthony HUGHES**. During the conversation, **HUGHES** asked **Bobby BELLAMY** "Remember that, that, that car I bring to you the other night." **Bobby BELLAMY** replied "Yeah." **HUGHES** then told **Bobby BELLAMY**, "I got one more car right here man." **Bobby BELLAMY** later replied, "Alright, alright, just give me a little bit." The call was later terminated. It is believed by your Affiant that this telephone conversation involves **Bobby BELLAMY** accepting a kilogram of cocaine HCL (referred to in code using the terminology of "car") to be dropped off later from a cocaine source identified as **HUGHES**. Also during the call, **HUGHES** indicated that he had dropped off cocaine to **BELLAMY** on a previous occasion.

54.        On July 26, 2002, at approximately 11:10AM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #196, from an unknown telephone number. During the call, **BELLAMY** told **Ray ABLE** that "they cooked out low and were no good". **BELLAMY** told **ABLE** that "Tony/Toney" had provided **BELLAMY** with "two nines and a four and a half" but when **BELLAMY** "cooked it, it came out to only fifteen grams". **BELLAMY** continued telling **ABLE** that "if it wasn't wet I could have sold it, if it was dry I could have sold it to people who put it up their noses." The conversation continued but later terminated. On July 26, 2002, at approximately 11:41AM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #200, from telephone number (321) 946-7561. The subscriber for this telephone number is **Toney DUNKLEY** and related investigation has enabled agents to determine the user of this telephone facility as **Toney DUNKLEY**. During the call, **DUNKLEY** told **BELLAMY**, "I have been calling for three days". **DUNKLEY** also said, "I need to see you". **DUNKELY** told **BELLAMY** that **DUNKLEY** had just talked to "P" and **BELLAMY** replied that he (**BELLAMY**) had also just spoke to "P", and had already spoke to "P" two or three times today. **BELLAMY** then told **DUNKLEY** that **BELLAMY** would talk to **DUNKLEY** later. Based upon this conversation, your Affiant believes that **BELLAMY** and **DUNKLEY** are discussing a mutual drug-related associated named "P", who is unidentified at this time. Based upon your Affiant's investigation in this matter and other intercepted conversations involving Bobby **BELLAMY**, **Ainsworth BROWN**, **Ray ABLE**, and others, your Affiant believes that the name "Tony/Toney" as noted above is a reference to **Toney DUNKLEY**.

58

Also, your Affiant has reviewed telephone analysis which corroborates that a telephone facility utilized by **Ray ABLE** has communicated with a telephone facility utilized by **Toney DUNKLEY**. The reference to "two nines and a four and a half" refers to a total quantity of cocaine exceeding a half-kilogram. Specifically, two nines refers to two-quarter kilograms of cocaine, each package consisting of nine ounces of cocaine. The other quantity of cocaine referred to is 4 ½ ounces. The reference to "cooked it, it came out to only fifteen grams" is in regard to the conversation of powder cocaine into crack cocaine. Your Affiant knows that an ounce of cocaine is equivalent to 28 grams and based upon adulterants or other additives contained within the cocaine powder, a certain quantity the of substance is lost during the conversation of powder cocaine to crack cocaine. Typically, an ounce or a "cookie" of crack cocaine will weigh less than a full "28 gram ounce" because of the loss of adulterants as noted. During the above noted conversation, **Bobby BELLAMY** told **ABLE** that each ounce of powder cocaine, weighing 28 grams, was only converting or "cooking" into crack cocaine that weighed 15 grams. The end result was that **BELLAMY** was complaining of "losing" 9 grams during the conversion process of the poor quality cocaine into crack cocaine. Your Affiant knows that **Bobby BELLAMY** and other members of his drug trafficking organization have been involved in the sale of "cookies" of crack cocaine typically weighing at least 20 grams.

55.        On July 26, 2002, at approximately 4:49 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #241, from telephone number (407) 376-1848. The subscriber for this telephone number is **Patrick PERRY** and

related investigation has enabled agents to determine the user of this telephone facility as **Patrick PERRY**. During the conversation, **Patrick PERRY** told **Bobby BELLAMY** "I got a little something on me, I got about three on me." **Bobby BELLAMY** replied "You do" and later in the conversation told **Patrick PERRY**, "I'll bring five there." The call was then terminated. At approximately 8:32P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #303, to telephone number (407) 376-1848. During the call, **BELLAMY** told **PERRY** that **BELLAMY** needed "two", in that **BELLAMY** had "Dred" waiting on him. **BELLAMY** further told **PERRY** that **BELLAMY** needed to give him (referring to Dred) "eight grand". **PERRY** told **BELLAMY** that he only had "a grand" on him right now, and indicated that he could have "it" in about thirty minutes. **BELLAMY** told **PERRY** that **BELLAMY** had "a single 'o'" on him now and that he just left "two" over at "Love's" house. **PERRY** told **BELLAMY** that he (**PERRY**) had someone who wanted "a spoon of hard" right now, and **BELLAMY** told **PERRY** that **BELLAMY** wanted to give the "'o' of soft" as **BELLAMY** did not want to ride with "it". **PERRY** then asked if he (**PERRY**) could go get "a spoon of hard" from "Love" and **BELLAMY** replied, "Yeah". At approximately 8:35P.m., identified as call# 304, Bobby **BELLAMY** placed an outgoing telephone call and spoke to **Joe BELLAMY**. During this conversation, Bobby **BELLAMY** asked **Joe BELLAMY** to "cut one of the o's real quick and cook me a spoon". **Joe BELLAMY** replied, "Yeah". Based on this series of telephone conversations, your Affiant believes that **BELLAMY** and **PERRY** were discussing the collection of drug proceeds because **BELLAMY** had "Dred" (identified in this investigation as **Ray ABLE**) waiting.

60

Initially, **PERRY** told **BELLAMY** that **PERRY** only had $1,000 on him right now, but could obtain an additional $1,000 within the next half-hour.   **BELLAMY** told **PERRY** that **BELLAMY** had $5,000 with him, along with one ounce of soft cocaine (single 'o') and that **BELLAMY** had just delivered two ounces of cocaine to "Love", a mutual drug-related associate of **BELLAMY** and **PERRY**.   After **PERRY** asked **BELLAMY** if **PERRY** could get a small quantity of crack cocaine ("a spoon of hard") from "Love", **Bobby BELLAMY** called **Joe BELLAMY** and asked **Joe BELLAMY** to remove a small portion of powder cocaine from a one ounce package and convert the small portion into crack cocaine for transfer to **Patrick PERRY**.   **BELLAMY** further told **PERRY** that **BELLAMY** wanted to give **PERRY** the one ounce of cocaine as **BELLAMY** did not want to carry it with him.

56.        On July 26, 2002, at approximately 11:19 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #318, to telephone number (321) 217-4266. The subscriber for this telephone number is "MD of Adiquest" and related investigation has enabled agents to determine the user of this telephone facility as **Ainsworth E. BROWN**.   During the conversation, **Bobby BELLAMY** told **Ainsworth BROWN** that he (**BELLAMY**) was "In the hood working man, ... had to sell on the street." **Ainsworth BROWN** told **BELLAMY** that he had "all this shit" and **BELLAMY** replied, "I have a lot of shit too".   **Bobby BELLAMY** then told **Ainsworth BROWN**,  "Tony/Toney slowed my shit down so bad when he sold me that bad shit man."   **Ainsworth BROWN** replied "Yeah." **Bobby BELLAMY** then said "I'm out  here on the street selling ... You got some white stuff?" **Ainsworth BROWN** replied  "Nah., Nah." **Bobby BELLAMY** then said,

61

"Everybody got white." Bobby **BELLAMY** then told **Ainsworth BROWN** that **BELLAMY** didn't know why **Ainsworth BROWN** had the "beige". **Bobby BELLAMY** next told **Ainsworth BROWN**, "That brown shit ain't selling worth a fuck right now." **Ainsworth BROWN** asked **Bobby BELLAMY** to "try to work" because **Ainsworth BROWN** had so much of "that shit". **Bobby BELLAMY** told **Ainsworth BROWN** that he (**BELLAMY**) had "a lot of white" and could possibly "mix it". **Bobby BELLAMY** stated, "Some people don't like the white, some people prefer the brown because they can whip it", then added, "some people like the brown because they can blow it up, some people like to cook to blow it up." **Bobby BELLAMY** later told **Ainsworth BROWN**, "I ain't got enough money to really buy nothing from ya man. I got two thousand dollars, unless you wanna work with me." **Ainsworth BROWN** replied, "Yeah man I'm going to work with you." **Bobby BELLAMY** stated, "That's the only way to get rid of it". Bobby **BELLAMY** told **Ainsworth BROWN** that "P" called **BELLAMY** from Jamaica earlier in the day and told **Ainsworth BROWN** that "P" asked **BELLAMY** why **BELLAMY** had not been "getting any" from "P". **Bobby BELLAMY** again told **Ainsworth BROWN**, "Tony/Toney gave me that bad shit." **Ainsworth BROWN** told **BELLAMY**, "You know what my shit is like" and stated that he (**BROWN**) didn't have to "trick" anybody. **Ainsworth BROWN** told **Bobby BELLAMY**, "If you want to work with me man just shout me and let me know." **Bobby BELLAMY** then replied "Yeah." The call was later terminated. It is believed by your Affiant that based upon the above series of conversations, **Bobby BELLAMY** was discussing past and future cocaine transactions with **Ainsworth BROWN**. **Bobby BELLAMY** is telling **Ainsworth**

62

BROWN that he has only two thousand dollars for cocaine and **Ainsworth BROWN** responds that he **(Ainsworth BROWN)** will continue to supply **Bobby BELLAMY** with cocaine despite his **(BELLAMY's)** lack of money. **Bobby BELLAMY** and **Ainsworth BROWN** both indicated that they each had cocaine readily available, although **Ainsworth BROWN** told **BELLAMY** that he had access to brown or off-white in color cocaine. **BELLAMY** expressed his concern in obtaining brown cocaine, in that "Tony/Toney" had previously provided **BELLAMY** with poor quality, brown in color cocaine. Based upon your Affiant's investigation in this matter and other intercepted conversations involving **Bobby BELLAMY, Ainsworth BROWN,** and others, your Affiant believes that the name "Tony/Toney" as noted above is a reference to **Toney DUNKLEY. Bobby BELLAMY** and **Ainsworth BROWN** also discussed the preference some traffickers have in terms of obtaining white or brown cocaine, and discussed that some cocaine converts better into crack cocaine. **Bobby BELLAMY** informed **Ainsworth BROWN** that he didn't have much money at the moment, and that **Ainsworth BROWN** would have to "front" cocaine to **BELLAMY** if **Ainsworth BROWN** wanted to conduct the drug business. **Ainsworth BROWN** told **Bobby BELLAMY** that he would supply cocaine to **BELLAMY** on a "front" basis. Also during this call, **Bobby BELLAMY** and **Ainsworth BROWN** discussed an individual identified only as "P". Your Affiant believes that "P", unidentified at this time, is a mutual drug-related associate of Bobby **BELLAMY, Ainsworth BROWN,** and **Toney DUNKLEY** (see call# 200 as noted above).

57.     On July 26, 2002, at approximately 11:39 P.m., **Bobby BELLAMY**

utilizing the Subject Telephone 1, made an outgoing telephone call, call #359, to telephone number (407) 657-2931. The subscriber for this telephone number is **Erica RAMIREZ** and related investigation has enabled agents to determine the user of this telephone facility as **Erica Renee RAMIREZ**. During this call, Bobby **BELLAMY** told **RAMIREZ** that he had to meet all of his "customers" before he went out. Your Affiant believes that Bobby **BELLAMY** was telling **RAMIREZ** that he had to meet all of his drug customers and conduct other drug transactions prior to being able to meet with **RAMIREZ**.

58.    On July 27, 2002, at approximately 12:43P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #462, from telephone number (407) 484-9626. During this call, **Gregory Bruce GALIN** informed **BELLAMY** that he (**GALIN**) was just down the street from **BELLAMY**'s house. **GALIN** asked **BELLAMY** for "two". **BELLAMY** told **GALIN** to come on down and pull into the driveway. Based upon this conversation, your Affiant believes that **GALIN** called **BELLAMY** to consummate a two ounce cocaine transaction. **BELLAMY** told **GALIN** to come to **BELLAMY**'s house to complete the drug transaction.

59.    On July 27, 2002, at approximately 12:53P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #465, to telephone number (321) 795-8150. This telephone number is subscribed to Terri Branch, and investigation has identified **Courtney Niocole BRADLEY** as the user of this telephone facility. During this call, **BRADLEY** asked Bobby **BELLAMY** how much he could get "beans" for. **BELLAMY** told **BRADLEY** that he tried to call "my boy" yesterday to get

64

"some". **BRADLEY** asked how much **BELLAMY** charged and **BELLAMY** replied, "Nine or ten dollars." **BRADLEY** then told **BELLAMY** that "Paul" could get "them" cheaper and **BELLAMY** then told **BRADLEY** that "Paul" got "them" from **BELLAMY**. **BRADLEY** also asked **BELLAMY**, "How much can you get a pound of weed for?" **BELLAMY** replied, "Seven-hundred". **BRADLEY** told **BELLAMY** that she wanted to come over to **BELLAMY**'s house to talk about getting "set up with something". Your Affiant believes that **BRADLEY** asked **BELLAMY** how much he could sell her ecstasy tablets (referred to as "beans") for and **BELLAMY** replied $9 or $10 per ecstasy tablet. **BELLAMY** told **BRADLEY** that **BELLAMY** also supplied ecstasy tablets to "Paul". **BRADLEY** asked how much could **BELLAMY** obtain a pound of marijuana for, and **BELLAMY** told her $700 per pound. **BRADLEY** indicated that she wanted to discuss these matters further with **BELLAMY** in person.

60.        On July 27, 2002, at approximately 1:03 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #467, from telephone number (917) 868-4145. During the conversation, **Ray ABLE** asked **Bobby BELLAMY**, "You think you can help out my friend, . . . my friend, he's down here from Jamaica. He has 9, 9 and 9." **ABLE** later says, "Bob. It's very nice." **Bobby BELLAMY** responds "Alright." Both then agree to meet at a future time. On this same date, at approximately 2:53P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #485, to telephone number (407) 376-1848. During the conversation, **Bobby BELLAMY** informed **Patrick PERRY** that he (**BELLAMY**) has more

"white" and that "the dude" is going to come over.  At approximately 3:42P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #500, to telephone number (407) 376-1848.  During the conversation, **Bobby BELLAMY** told **Patrick PERRY** that once **PERRY** came up with the "three grand" that **PERRY** owed to **BELLAMY**, that **BELLAMY** could sell **PERRY** "nine more".  **PERRY** then told **BELLAMY** that **PERRY** had "four" on him if **BELLAMY** wanted "it".  **BELLAMY** told **PERRY** that **BELLAMY** was supposed to meet with "Dred".  **PERRY** told **BELLAMY** that **PERRY** wanted to get "the nine" and would meet with **BELLAMY** later.  Based on this series of conversations, your Affiant believes that **Ray ABLE** informed **Bobby BELLAMY** that **ABLE** had at least 9 ounces of cocaine (a quarter-kilogram) available that had recently been transported to the United States from Jamaica.  **BELLAMY** agreed to accept delivery of the 9 ounces of cocaine from **ABLE**, then called **PERRY** and told **PERRY** that if **PERRY** paid **BELLAMY** some of the money that **PERRY** owed, that **BELLAMY** could provide **PERRY** with 9 ounces of cocaine.  **PERRY** agreed to obtain the 9 ounces of cocaine from **BELLAMY** and stated that he had $4,000 to pay **BELLAMY**.

61.     On July 27, 2002, at approximately 4:50 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #517, from telephone number (917) 868-4145. During the conversation, **Bobby BELLAMY** tells **ABLE**, "I'm on the way to my house 'Dred'. " **ABLE** replies, "Alright, now come." The call was later terminated.  Surveillance then observed **ABLE** depart in the 1998 blue Lincoln Navigator (**ABLE** was the sole occupant) with Florida license T12-ICI from **2401 Cancun Court,**

**Kissimmee, Florida.** This is the same premises that **ABLE** had traveled to on 06/25/2002 after delivering cocaine to **BELLAMY** in Orlando, Florida and after obtaining some monies from **BELLAMY** to facilitate the purchase of the cocaine. Shortly thereafter, a marked Osceola County Sheriff's Office cruiser initiated a traffic stop on the blue Navigator on the Florida Turnpike in Osceola County, FL. Approximately 9 ounces of powder cocaine (1/4 kilogram) was seized inside **ABLE**'s vehicle. On July 27, 2002, at approximately 7:59 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #580, from telephone number (917) 868-4145. During the conversation, **Bobby BELLAMY** tells **ABLE,** "I've been waiting on you, calling you, what happened? **ABLE** replied. "I have problem man, on the road man." **Bobby BELLAMY** then says, "Oh yeah." **ABLE** then says, "Over Kissimmee man, problem over Kissimmee." **Bobby BELLAMY** then replied, "You got to stay from over there man." The call was later terminated. It is believed by your Affiant that based upon the conversations and surveillance, that **ABLE** was en route to supply **Bobby BELLAMY** with nine ounces of cocaine on this occasion.

62.	On July 27, 2002, at approximately 5:59 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #533, from telephone number (407) 312-4283. The subscriber for this telephone number is Jason Rivera and related investigation has enabled agents to determine the user of this telephone facility as **Jerry Vega ORTIZ.** During the conversation, **ORTIZ** told **Bobby BELLAMY,** "This is 'J'." "Checking up with you, see if you need anything ." **Bobby BELLAMY** replied "I need a hundred man . . . for nine dollars for me man." **ORTIZ** responded "Damn man, I can't do

it man . . . not right now." **Bobby BELLAMY** then asked "What about nine-fifty?" **ORTIZ** told **Bobby BELLAMY** "Damn man. I am going to lose out on fifty but I'll make up for it tonight." "So that's why I'm going to do it for you." **Bobby BELLAMY** then said "Alright." The call was later terminated. It is believed by your Affiant that during the conversation **ORTIZ** and **Bobby BELLAMY** negotiated for 100 ecstasy pills for $9.50 per pill. Based on this telephone conversation and other intercepted telephone communications, some of which are noted below, **ORTIZ** has been identified as **Bobby BELLAMY**'s primary ecstasy source of supply.

63.       On July 27, 2002, at approximately 9:55P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #604, from telephone number (407) 484-9626. During the conversation, **Gregory Bruce GALIN** told **Bobby BELLAMY** that he (**GALIN**) wanted to "grab another one". **BELLAMY** asked, "Just one?" and **GALIN** replied, "Just one". Your Affiant believes that during this telephone call, **GALIN** told **BELLAMY** that he wanted to purchase an additional ounce of cocaine from **BELLAMY**.

64.       On July 28, 2002, at approximately 4:36 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #732, from telephone number (407) 376-1848. During the conversation, **PERRY** complains to **Bobby BELLAMY**, "That this ain't doing what the other one did." **Bobby BELLAMY** replies that it came "Off the same brick." **PERRY** then says it "Dropped 25" and **Bobby BELLAMY** tells **PERRY** it "Dropped 22." The call was later terminated. It is believed by your Affiant that

68

during the conversation **PERRY** and **Bobby BELLAMY** discuss the quality of cocaine and discuss the conversion of cocaine HCL to ounces of crack cocaine that the weight dropped to twenty-five grams for **Bobby BELLAMY** and twenty-two grams for **PERRY**. Your Affiant knows that 28 grams is equivalent to one ounce.

65.    On July 29, 2002, at approximately 6:03 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #920, from telephone number (321) 230-0676. The subscriber for this telephone number is unknown. The user of this telephone number has self-identified himself as "Avery." During the conversation, **Bobby BELLAMY** asks, "Avery" LNU "How you want it." "Avery" LNU says "Sandwich." **Bobby BELLAMY** then asks "Whole?" "Avery" LNU at this point asks **Bobby BELLAMY** "What the number 8 is going for, the 41/2?" **Bobby BELLAMY** tells "Avery" LNU "thirty-five the hard white, the brown shit thirty-four." "Avery" LNU then responds, "Nah, I want that white." The call was later terminated. It is believed by your Affiant that during the conversation "Avery" LNU and **Bobby BELLAMY** discussed the price for eight ounces of cocaine (just under a quarter-kilogram of cocaine, which would be 9 ounces) with "thirty-five" for the "white" (white in color cocaine of good quality) being $3,500 and "thirty-four" for the "beige" (beige or off-white in color cocaine of an inferior quality) being $3,400. Avery LNU then tells **Bobby BELLAMY** that he wants the white cocaine (superior quality).

66.    On July 29, 2002, at approximately 6:17 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #926, from telephone number (407) 467-4904. The subscriber for this telephone number is Centex Homes, Attn:

69

**Paul SMITH**, and the user of this telephone facility has been identified as **Paul Demitrius SMITH**. During the call, **SMITH** asked Bobby **BELLAMY**, "How much can you sell an 'o' to me for?" **BELLAMY** told **SMITH** "eight" and said that he had been trying "eight-fifty". **SMITH** told **BELLAMY** okay, and stated that he (**SMITH**) might buy another one because **SMITH** has "someone else". The call was later terminated. Your Affiant believes that **SMITH** asked how much **BELLAMY** would sell one ounce of cocaine to **SMITH** for; **BELLAMY** told **SMITH** $800 per ounce of cocaine and that **BELLAMY** had recently charged up to $850 per ounce. **SMITH** indicated that he might purchase two ounces of cocaine from **BELLAMY**, as **SMITH** had his own customer who wanted to purchase one ounce of cocaine from **SMITH**.

67.        On July 29, 2002, at approximately 9:26 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #983, from telephone number (407) 340-0308. The subscriber for this telephone number is **Kristina GUSE**. During the conversation, **Kristina GUSE** asked **Bobby BELLAMY** "Is a whole eight or 8-5". **Bobby BELLAMY** replied, " 8-5." **Kristina GUSE** then asked, " You won't do eight?"..."Jeff wants two of them." **Bobby BELLAMY** later told **GUSE**, "Get them tomorrow." The call was later terminated. It is believed by your Affiant that during the conversation **Kristina GUSE** asked **Bobby BELLAMY** for two ounces of cocaine for "Jeff" (later identified as **Jeff GREATHOUSE**). **Bobby BELLAMY** told **GUSE** the price per ounce would be $850 and directed **GUSE** to obtain the two ounces the next day.

68.        On July 29, 2002, at approximately 10:14P.m., **Bobby BELLAMY** utilizing

70

the Subject Telephone 1, received an incoming telephone call, call #962, from telephone number (407) 808-1127. The subscriber for this telephone number is Isabell Gamble, and the user of this telephone facility has been identified as **Albert Mosselors HOPKINS.** During the call, **HOPKINS** asked **Bobby BELLAMY** about prices of "thirty-five" and "thirty-four". **BELLAMY** told **HOPKINS**, "Thirty-four for the beige". **HOPKINS** then replied, "Thirty-five for the white though, right?" **BELLAMY** told **HOPKINS**, "Yes". **BELLAMY** then told **HOPKINS** to take "fifty" off of "it". Your Affiant believes that during this conversation, **Bobby BELLAMY** and **HOPKINS** discussed the price of 4 ½ ounces of cocaine and discussed price variances dependant on the quality of the cocaine to be sold. **BELLAMY** told **HOPKINS** that 4 ½ ounces of beige in color cocaine (inferior quality) could be sold for $3,400 and 4 ½ ounces of white in color cocaine (superior quality) could be sold for $3,500. **BELLAMY** told **HOPKINS** that he could earn a profit of $50 by completing the cocaine sale.

69.       On July 30, 2002, at approximately 12:46AM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #1024, to telephone number (407) 340-0308, During the conversation, **BELLAMY** told **GUSE** that his "people be Jamaican". **GUSE** told **BELLAMY** that he know she "doesn't snort coke" and that **GUSE** only wanted a "twenty", not even "two lines". **GUSE** further told **BELLAMY** that "Kim" did not want "drugs for free". The call was later terminated. Your Affiant believes that Bobby **BELLAMY** was discussing with **GUSE** his (**BELLAMY**'s) relationship with Jamaican Nationals who are supplying **BELLAMY** with cocaine.

71

70.        On July 30, 2002, at approximately 5:46 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1127, from telephone number (407) 345-2000. The subscriber for this telephone number is Harcourt, Inc. Investigation has identified the user of this telephone number and the participant in the below noted conversations with **Bobby BELLAMY** as **Ainsworth BROWN**. During the conversation, **Ainsworth BROWN** tells **Bobby BELLAMY** "My boys got the fish scale that you've been looking for." Later in the conversation **Bobby BELLAMY** asks **Ainsworth BROWN**, "Hey, you ain't got a half of that beige?" **Ainsworth BROWN** replies, "Yeah. I got a whole thing." **Bobby BELLAMY** then says, "Alright. Alright. Look, why don't you bring me a half ..." **Ainsworth BROWN** then says "Huh?" **Bobby BELLAMY** tells **Ainsworth BROWN**, "Bring me a half when you get off work and let me get you the rest of the money." **Ainsworth BROWN** later in the conversation says "Alright, so I'll phone you when I get off man." **Bobby BELLAMY** replies "Alright." It is believed by your Affiant that **Bobby BELLAMY** requested ½ kilo of beige-colored cocaine from one of his cocaine sources of supply, **Ainsworth BROWN**, to be provided later.

71.        On July 30, 2002, at approximately 6:21 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1138, from telephone number (407) 282-3931. The subscriber for this telephone number is unknown. Investigation has identified the user of this telephone number on this particular occasion as **Patrick Anthony HUGHES**. During the conversation, **HUGHES** told **Bobby BELLAMY** that he (**HUGHES**) would "bring something today". **BELLAMY** told **HUGHES** to give him

72

until 9P.m. as **BELLAMY** was "working".   The call was later terminated.   Your Affiant believes that during this conversation, **HUGHES** told **BELLAMY** that **HUGHES** would be able to deliver additional drugs to **BELLAMY** later in the day.

72.        On July 30, 2002, at approximately 8:38P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1181, from telephone number (407) 376-1848. During the call, Bobby **BELLAMY** told **Patrick PERRY**, "I'm trying to hit 'Dred' to get some more white". **PERRY** told **BELLAMY** that **PERRY** was almost through and when **BELLAMY** came by "Tangelo", that **BELLAMY** could "grab a little money" from **PERRY**. The call was later terminated. On this same date, at approximately 10:08 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1196, from telephone number (917) 868-4145.   During the conversation, **Bobby BELLAMY** told **Ray ABLE** that he was making a last stop and then "Dred" would be all square." The call was later terminated.   On July 30, 2002, at approximately 10:09 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing  telephone call, call #1197, to  telephone number (407) 808-1127. The subscriber for this telephone number is Isabel Gamble and related investigation has identified the user of this telephone facility as **Albert HOPKINS**. During the conversation, **Bobby BELLAMY** instructs **HOPKINS** to, "Go the Circle K and get that same Jamaican for me and bring him round to my momma's house." **HOPKINS** replies "Who that now?" **Bobby BELLAMY** responds  "That same Jamaican in that Navigator ... Show him where my momma live. Alright." **HOPKINS** replies, "O.K. Alright." The call was then terminated.

A traffic stop was initiated by the Osceola County Sheriff's Office later that evening on **Ray ABLE**, driving a Lincoln Navigator, on the Florida turnpike in Osceola County, FL. That stop resulted in the seizure of $12, 924.00. On July 31, 2002, at approximately 2:04 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1269, from telephone number (954) 326-3960. The subscriber for this telephone number is unknown, but related investigation has identified the user of this telephone facility as **Ray ABLE**. That conversation is related to the traffic stop and **ABLE** told **Bobby BELLAMY** regarding the seized money that "I tell them I win it from a dog fight." **Bobby BELLAMY** replied "From a dog fight. There gonna keep that." **ABLE** responded "Yeah." **Bobby BELLAMY** then told **ABLE**, "You can't say that that's illegal 'Dred'. " **ABLE** told **Bobby BELLAMY,** "I did not know that Bob." **Bobby BELLAMY** then said, "You should have told them you came here to buy a car man, see what I'm saying." **ABLE** replied "Yeah." **Bobby BELLAMY** then told **ABLE**, "Yeah, something like that man." The call was later terminated. It is believed by your Affiant based upon the above series of conversations and surveillance on July 30, 2002, that **Bobby BELLAMY** was collecting money from his drug customers, including Patrick **PERRY**, to pay **Victor ABLE,** who is one of his (**BELLAMY**'s) cocaine sources of supply, for a cocaine transaction. After the above noted money seizure, **Bobby BELLAMY** tells **ABLE** that he (**ABLE**) should have given the police a legitimate reason for possessing the money such as that he was here to buy a car or a similar story.

73.        On July 31, 2002, at approximately 3:27P.m., **Bobby BELLAMY** utilizing

74

the Subject Telephone 1, received an incoming telephone call, call #1284, from telephone number (407) 345-2000. During the call, **Ainsworth BROWN** told Bobby **BELLAMY** that he wanted to meet with **BELLAMY** later in the evening because (**Ainsworth BROWN**) would "be straight tomorrow" and that **Ainsworth BROWN** "could have some of that" for **BELLAMY** the following day. Your Affiant believes that during this conversation, **Ainsworth BROWN** wanted to see **Bobby BELLAMY** later during the evening of July 31, 2002, in order to receive money so that **Ainsworth BROWN** could supply **BELLAMY** with cocaine the following day.

74.    On July 31, 2002, at approximately 7:38P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1384, from telephone number (407) 467-4904. During the call, **Paul Demitrius SMITH** asked Bobby **BELLAMY** for "thirty roller skates". **BELLAMY** told **SMITH** that **BELLAMY** would call **SMITH** later. This call was then terminated. At approximately 7:38P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1420, from telephone number (407) 467-4904. During this call, **SMITH** told **BELLAMY** that **SMITH** wanted "two". **BELLAMY** then told **SMITH** that **SMITH** could "go ahead to the house" and that **BELLAMY** was on the way. Based on these conversations, your Affiant believes that **SMITH** called **BELLAMY** on this occasion in order to purchase thirty ecstasy tablets from **BELLAMY**. Your Affiant has learned through interviews or debriefings of convicted ecstasy traffickers that ecstasy is commonly referred to as "roller skates". **SMITH** also called **BELLAMY** and told **BELLAMY** that **SMITH** wanted to purchase two ounces of cocaine.

75

75.           On August 1, 2002, at approximately 1:17P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1478, from telephone number (407) 351-0129. The subscriber for this telephone number is unknown. During the conversation, an unknown male self-identified himself as "Tony". During this conversation, Tony LNU told **BELLAMY** that a second unknown male, later identified by **BELLAMY** as "Quick", wanted "two of them". **BELLAMY** told "Tony" to have "Quick" come by **BELLAMY**'s house later.  On this same date,  at approximately 3:01P.m.,  **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #1488, to telephone number (407) 351-0129.   The subscriber for this telephone number is unknown.  During this call, **BELLAMY** told Tony LNU (same individual intercepted in call #1478 as noted above) to call "Quick" to see what "Quick" wanted **BELLAMY** to do.  Tony LNU told **BELLAMY**, "he wants a deuce" and wanted to meet **BELLAMY** around 5:30P.m.. **BELLAMY** told Tony LNU that he would bring "it" with him over "Tony's way", but for Tony LNU to make sure that "Quick" wanted "it", so that **BELLAMY** would not bring "it" for nothing.  At approximately 3:21P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1494, from telephone number (407) 383-5370. The subscriber for this telephone number is unknown.  During the conversation, a male later identified as **James Rudolph CHILES** told **BELLAMY** that he (CHILES) was finishing up.  **CHILES** then asked **BELLAMY** for "the thing".  **CHILES** told **BELLAMY** that he (**CHILES**) would be at "Tony's" house in about 1 ½ hours.  **BELLAMY** told **CHILES** that **BELLAMY** would be at his mother's house later.   At approximately 5:46P.m., **Bobby**

76

**BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1531, from telephone number (407) 443-6915. The subscriber for this telephone number is unknown. During the conversation, **CHILES** related to **BELLAMY** that he **(CHILES)** was presently in the Pine Hills area picking up some money. **BELLAMY** told **CHILES** to bring "sixteen-five". **CHILES** replied, "I'll bring you what I got". At approximately 5:46P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1534, from telephone number (407) 351-0129. The subscriber for this telephone number is unknown. During the conversation, Tony LNU asked **BELLAMY** if **BELLAMY** was "ready". **BELLAMY** told Tony LNU that **BELLAMY** had just spoken to "him" and that "he" was on the way to see **BELLAMY**. Tony LNU told **BELLAMY** that Tony LNU just wanted to make sure because that was his (Tony's) word. Subsequent to this series of telephone calls, surveillance agents observed **CHILES** arrive at **BELLAMY's** residence located at **5925 Danube Way, Orlando, Florida**, then enter the residence by himself. Shortly thereafter, **CHILES** departed from **BELLAMY's** residence and was followed until **CHILES'** vehicle traveled westbound on the East West Expressway. At approximately 6:30P.m., a traffic stop was initiated on the vehicle occupied by **CHILES** (passenger) and a second person. The stop culminated in the seizure of approximately two ounces of cocaine HCl, contained within a clear plastic bag. The substance later field-tested positive for the presence of cocaine. In a post-Miranda statement, **CHILES** acknowledged that the cocaine was his and admitted that he had purchased the cocaine for $1,600.00 from "Bob" who lives behind the Winn Dixie. **CHILES** indicated to officers that "Bob" had sold him the

77

cocaine in the kitchen area of the residence, and that **CHILES** had purchased cocaine from "Bob" on approximately 20 prior occasions. **CHILES** told officers that he has observed approximately ½ kilogram of cocaine inside "Bob's" house in the past and that "Bob" is involved in "cooking" the cocaine into crack cocaine, using microwaves inside the residence. Based upon the series of telephone conversations as noted above and the seizure of two ounces of cocaine from **CHILES**, your Affiant believes that **BELLAMY** had agreed to supply up to two ounces of cocaine powder to **CHILES** in exchange for $1,600.00. This cocaine transaction was brokered by the unknown male "Tony" LNU, as evidenced during the three conversations outlined above.

76.          On August 1, 2002, at approximately 7:45 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1564, from telephone number (407) 897-6074. The subscriber for this telephone number is **Kristina GUSE** and related investigation has enabled agents to determine the user of this telephone facility as **Kristina Ann GUSE**. During the conversation, **GUSE** asked **Bobby BELLAMY**, "Can you bring me two wholes later when you come." **Bobby BELLAMY** replied "Huh?" **GUSE** then asked "Can I tell him he'll have it tonight and **Bobby BELLAMY** responded, "Yeah." The call was later terminated. On August 1, 2002, at approximately 8:11 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1571, from telephone number (407) 897-6074. During the conversation, **GUSE** asked **Bobby BELLAMY**, "Since I'm not making nothing out of Jeff, can you and him just do it together?" **Bobby BELLAMY** replied "Who is this?" **GUSE** responded, "That white boy

78

who looks just like my brother" and then **GUSE** told **Bobby BELLAMY,** "You can call him at 781-7080." **Bobby BELLAMY** told **GUSE** "I'm gonna go home and I'm gonna bag them up. Tell Jeff to meet me at your home." The call was later terminated. On August 1, 2002, at approximately 9:19 P.m., **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1593, from telephone number (407) 617-7085. The subscriber for this telephone number is unknown. However, investigation has identified the user of this telephone facility as **Jeffrey Wayne GREATHOUSE**. During the conversation, **GREATHOUSE** told **Bobby BELLAMY** "This is Jeff." **Bobby BELLAMY** replied "What up Jeff." **Bobby BELLAMY** asked **GREATHOUSE,** "You want me to just take it to Kris' house?" **GREATHOUSE** responded, "It doesn't matter to me dog, it's up to you." **Bobby BELLAMY** then told **GREATHOUSE,** "Alright. I'll take it to Kris' house." The call was later terminated. Approximately eight minutes after departing **Kristina GUSE's** house, the Orlando Police Department initiated a traffic stop on **GREATHOUSE** in Orlando, FL, that resulted in the seizure of approximately two ounces of cocaine and an H&K .40 caliber semi-automatic handgun, fully loaded with a round in the chamber. It is believed by your Affiant based upon the above series of conversations and surveillance on August 1, 2002, that **Bobby BELLAMY** arranged to deliver two ounces of cocaine to **GREATHOUSE** at **Kristina GUSE's** house with **Kristina GUSE** acting as the broker. Prior to the purchase of cocaine by **GREATHOUSE, GUSE** had discussed the price of "eight" (referring to $800.00) or "eight-fifty" (referring to $850.00) per ounce of cocaine.

77.        On August 1, 2002, at approximately 1:23 PM, **Bobby BELLAMY** utilizing

the Subject Telephone 1, received an incoming telephone call, call #1479, from telephone number (407) 248-1285. This telephone number is subscribed to James McMillan but the user of the facility has not yet been identified. During this conversation, **BELLAMY** told an unknown male, "Supposed to get that white today ... got wet beige". The unknown male later told **BELLAMY** that it didn't matter. **BELLAMY** replied, "I'm trying to get that flake".

On August 1, 2002, at approximately 7:40 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1563, from telephone number (321) 217-4266. During the conversation, **Ainsworth BROWN** told **Bobby BELLAMY,** "Probably later on tonight or tomorrow man I'll have that crystal." **Bobby BELLAMY** replied, "Alright." The call was later terminated. At approximately 9:49PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1605, from telephone number (407) 227-4318. The subscriber to this telephone number is unknown but the user of this telephone facility on this occasion has been identified as Patrick Anthony **HUGHES.** During the conversation, **BELLAMY** told **HUGHES** that he had been waiting for **HUGHES** to call. **HUGHES** stated, "I'm here waiting for the car". **BELLAMY** told **HUGHES,** "I need that for Friday". **BELLAMY** and **HUGHES** discussed the location where a transaction was to be completed, with **BELLAMY** wanted to meet at **BELLAMY's** house or **BELLAMY's** mother's house and **HUGHES** wanted to meet in the Pine Hills area. **BELLAMY** further stated, "I don't want to meet in a parking lot" and thereafter asked HUGHES, "Is a half or whole thing?" **HUGHES** told **BELLAMY** "remember what we talked about this morning". The conversation was then terminated. At approximately 10:19PM,

80

Bobby BELLAMY utilizing the Subject Telephone 1, received an incoming telephone call, call #1614, from telephone number (407) 227-4318. During this conversation, BELLAMY told HUGHES, "I'm almost there". The conversation was then terminated. At approximately 10:30PM, Bobby BELLAMY utilizing the Subject Telephone 1, received an incoming telephone call, call #1618, from telephone number (407) 227-4318. During this conversation, BELLAMY informed HUGHES that he was on I-4 and asked HUGHES to "park in my momma's driveway and turn your lights off". HUGHES told BELLAMY, "Alright". BELLAMY told HUGHES that he would be there in five minutes. Shortly after this particular telephone conversation, surveillance agents observed BELLAMY and HUGHES meet at a convenience store located just outside the Tangelo Park area. Based upon this series of telephone conversations and the related surveillance, it is believed by your Affiant that BELLAMY initially informed the unknown male that all BELLAMY had available for sale at the moment was cocaine that was wet and beige in color (referring to poor quality). BELLAMY further informed the unknown male that BELLAMY was trying to get cocaine of better quality, which was white in color ("flake"). During a subsequent conversation, Ainsworth BROWN told Bobby BELLAMY that he would have cocaine available for sale to Bobby BELLAMY later that night or the next day. Ainsworth BROWN utilized the term "crystal" to refer to high quality cocaine. Finally, BELLAMY made arrangements to meet and did actually meet with HUGHES for the purpose of acquiring one kilogram of cocaine from HUGHES. Based upon other intercepted communications related to this matter, your Affiant believes that HUGHES had arranged with an unknown

81

female to transport the kilogram of cocaine to the area close to where **BELLAMY** and **HUGHES** had met. Your Affiant further believes that the unknown female became nervous and departed the area prior to delivering the cocaine to **BELLAMY** on the behalf of **HUGHES** (see call# 1889 with **Patrick PERRY** and call# 2993 with an unknown female).

78. On August 1, 2002, at approximately 3:05PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #1489, to telephone number (407) 376-1848. During this call, **Bobby BELLAMY** told **Patrick PERRY** that **BELLAMY** was going to meet "the dude" around 4-5:30PM. **PERRY** told **BELLAMY** that **PERRY** would "be ready" by 4 or 5PM, as **PERRY**'s "shit is about to blow up ... is cranking up". Your affiant believes that during this conversation, **PERRY** informed **BELLAMY** that **PERRY** was presently involved in the conversion of powder cocaine into crack cocaine. At approximately 3:45PM, agents conducted a drive-by surveillance at **PERRY**'s residence, **12642 Old Castle Drive, Orlando, Florida**, and observed three of **PERRY**'s known vehicles parked in the driveway. After temporarily discontinuing surveillance at **PERRY**'s residence, agents returned at approximately 5PM. At this time, agents observed no vehicles present at **PERRY**'s residence.

79. On August 1, 2002, at approximately 9:33 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1597, from telephone number (407) 414-7541. The subscriber for this telephone number is unknown. During the conversation, the unknown male self-identified himself as "Eddie" and said "

82

Bobby, what up dog it's Eddie." **Bobby BELLAMY** replied, "What's up?" "Eddie" LNU then asked, "Is it possible for you to get me some roller skates?" **Bobby BELLAMY** said "How many?" "Eddie" LNU responded, "I need about 250." **Bobby BELLAMY** told "Eddie" LNU, "Daytime for that Eddie. You wait too late." "Eddie" LNU replied "Yeah" and said "I'll give you a call tomorrow." The was later terminated. It is believed by your Affiant that during the conversation "Eddie" LNU asked **Bobby BELLAMY** if he had 250 ecstasy pills available for sale and **Bobby BELLAMY** replied that he did not because he ("Eddie") needed to contact **BELLAMY** during the daytime for the ecstasy. During the call, "Eddie" used the code language of "roller skates" when referring to the ecstasy pills. Your Affiant has learned through interviews or debriefings of convicted ecstasy traffickers that ecstasy is commonly referred to as "roller skates".

80.      On August 2, 2002, at approximately 6:49 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1851, from telephone number (321) 217-4266. During the conversation, **Ainsworth BROWN** asked **Bobby BELLAMY**, "You ready for me." **Bobby BELLAMY** replied, "That shit selling slow . . . that beige. I like the other brown you gave me." **Ainsworth BROWN** then said "So you ain't got nothing man. You can't buy the white off me man." **Bobby BELLAMY** responded, "Huh? ... Yes, soon as I come from my mom's house. That white man. I need the white. Got some?" **Ainsworth BROWN** then said "Yeah man." **Bobby BELLAMY** replied, "Alright." **Bobby BELLAMY** then told **Ainsworth BROWN**, "I'm gonna buy some, just give me a little to mix with that other shit man." **Ainsworth BROWN** replied, "Alright."

83

The call was later terminated. It is believed by your Affiant that based upon the conversation, **Bobby BELLAMY** was telling **Ainsworth BROWN**, one of his Jamaican cocaine sources of supply, that he (**BELLAMY**) needed white colored cocaine because the beige colored cocaine was not selling fast (due to the inferior quality). **Bobby BELLAMY** and **Ainsworth BROWN** agreed to talk later.

81.    On August 2, 2002, at approximately 7:41 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1863, from telephone number (407) 616-7016. The subscriber for this telephone number is unknown. The user of this telephone number has previously self-identified himself as "Truck." During the conversation, "Truck" LNU told **Bobby BELLAMY**, "He got sixteen hundred. He's trying to get two ounces of powder." **Bobby BELLAMY** replied "Oh. As soon as I get it. I will let you know." **Bobby BELLAMY** later told "Truck" LNU "I ain't got but one hard." "Truck" LNU asked "Is it twenty-eight?" **Bobby BELLAMY** then said " Huh, come on bro. Don't say that on the phone." "Truck" LNU replied " My bad, my bad, my bad, my bad, my bad, my bad." **Bobby BELLAMY** then told "Truck" LNU "You know you can't get no twenty-eight on hard man." The call was later terminated. It is believed by your Affiant that during the conversation "Truck" LNU told **Bobby BELLAMY** that an unknown third party had $1,600.00 and was attempting to obtain two ounces of cocaine HCL. **Bobby BELLAMY** told "Truck" LNU that he (**BELLAMY**) had only one ounce of crack cocaine at that time. "Truck" LNU then asked **Bobby BELLAMY** if that one ounce of crack cocaine weighed twenty-eight grams, which is equivalent to one ounce. **Bobby BELLAMY** warned

84

"Truck" LNU not to say " twenty-eight" on the telephone and reminded "Truck" LNU that you can't get twenty-eight grams of crack cocaine per ounce after converting cocaine HCL to crack cocaine.

82.        On August 2, 2002, at approximately 9:31  PM,  **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #1889,  from telephone number (407) 376-1848.  During the conversation, **Bobby BELLAMY** told **Patrick PERRY,** "Last night right, you remember when you saw the Jamaican dude over there in front of my momma's house?" **Patrick PERRY** then asked "Jamaican dude ... Patrick?" **Bobby BELLAMY** responded, "Yeah in the yellow car right." **Patrick PERRY** replied, "Yeah. I know who it was" and **Bobby BELLAMY** then said, "Right. He was supposed to have one for me right. His lady was supposed to be bringing it up here to the Amoco." **Bobby BELLAMY** then told **Patrick PERRY** during the conversation "Me and AJ ride in my truck.  Follow him up there.  Every time I pulled up on the lady she pulled off and he wouldn't answer his damn phone." **Bobby BELLAMY** then said, "Now my boy, my other boy, my main boy that I used to deal with, his brother is gonna hook me up with some white man." The call was later terminated. It is believed by your Affiant that during the conversation, **Bobby BELLAMY** told **Patrick PERRY** that the delivery of one kilogram of cocaine the prior night by a Jamaican referred to as "Patrick" was unsuccessful, although attempted, and that the brother of another cocaine source who used to supply **Bobby BELLAMY** with cocaine is going to provide cocaine to him at a later time.  Investigation related to this matter has identified **Hughon BROWN** and **Ainsworth BROWN** as brothers

85

and based on the entirety of your Affiant's knowledge in this case, your Affiant believes that **BELLAMY** is referring to **Hughon BROWN** and **Ainsworth BROWN** during **BELLAMY**'s conversation with **PERRY**. Also, your Affiant believes that **BELLAMY**'s reference to "Patrick" during the conversation with **PERRY** is to **Patrick Anthony HUGHES.**

83.        On August 3, 2002, at approximately 1:42 PM. , **Bobby BELLAMY** utilizing Subject Telephone 1, placed an outgoing telephone call, call # 2047, to telephone number (407) 375-4800. This telephone number is subscribed to Gillis Brummitt. Investigation has identified the user of this phone as Gillis Brummitt. During the conversation, **Bobby BELLAMY** told Brummitt, "You sold that stuff?" Brummitt responded "Homeboy bought the one. Kenny bought the ball. **Bobby BELLAMY** replied "That's it?". Brummitt then told **Bobby BELLAMY,** "I gave the money to 'Little Joe', I sold, I sold half to someone. I think I put $1200 in there." **Bobby BELLAMY** then asked, "You sold a half to Joe?" Brummitt responded, "No, half of hard and a whole of soft and I think $1250 in bag and an ounce hard I had left." The call was later terminated. It is believed by your Affiant that during this conversation, **Bobby BELLAMY** asked Brummitt what drugs Brummitt had distributed for **Bobby BELLAMY** and Brummitt replied that an unknown male ("Homeboy") bought one, believed to be one ounce of cocaine, and "Kenny" LNU bought "the ball," believed to be 3 grams of cocaine (commonly referred to be street-level drug traffickers as an "eight-ball" of cocaine). It is believed that Brummitt told **Bobby BELLAMY** that Brummitt gave the money ($1,250) from the above drug sales to "Little Joe" along with an ounce of crack cocaine. Investigation has identified "Little Joe" as **Joe BELLAMY.**

86

84.         On August 3, 2002, at approximately 1:44 PM. , **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2048, to telephone number (321) 228-8355. This telephone number is subscribed to **Willie MURPHY**. The answering machine picked up the call and stated "This is Coop." **Bobby BELLAMY** left the following message on the answering machine: "Just to let you know, I got the white fingers, peace." The call was then terminated. It is believed by your Affiant that during this call, **Bobby BELLAMY** was contacting the user of the phone, **Willie MURPHY**, to inform him that he (**BELLAMY**) had cocaine ("white fingers") available. At approximately 2:06PM. , **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2059, to telephone number (321) 228-8355. This telephone number is subscribed to **Willie MURPHY** and the user of this telephone facility has been identified as **Willie H. MURPHY**. During this call, **BELLAMY** spoke to **MURPHY** and advised, "I got those white fingers". **MURPHY** replied, "I'll probably see you today ... I already got some from 'Tony Ricks'". **BELLAMY** stated, "It's good-ass white though". **MURPHY** told **BELLAMY**, "Alright". This conversation was then terminated. Based on this conversation, your Affiant believes that **BELLAMY** told **MURPHY** that **BELLAMY** had cocaine available for sale to **MURPHY** and **MURPHY** told **BELLAMY** that he (**MURPHY**) had already obtained some cocaine from "Tony Ricks". Your Affiant knows that Anthony Julius Ricks, a/k/a Tony Ricks, is a cocaine supplier involved in the trafficking of cocaine with others in the Tangelo Park area and elsewhere.

85.         On August 3, 2002, at approximately 1:59 PM. , **Bobby BELLAMY**

87

utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2055, to telephone number (407) 616-4284. This telephone number is subscribed to **Texas GOBERN** and the user of this telephone facility has been identified as **Texas Arnell GOBERN**. **Bobby BELLAMY** left the following message on the voice mail : "Tex, give me a holler. I got that good white, peace." The call was then terminated. It is believed by your Affiant that during this call, **Bobby BELLAMY** was contacting the user of the phone, identified as **Texas GOBERN**, to inform him that he **(BELLAMY)** had cocaine ("good white") available.

86.        On August 3, 2002, at approximately 2:57 PM. , **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2071, to telephone number (407) 383-9734. This telephone number is subscribed to **Erica RAMIREZ** and related investigation has enabled agents to determine the user of this telephone facility as **Erica Renee RAMIREZ**. During the conversation, **RAMIREZ** told **Bobby BELLAMY**, "We ate those beans and they were kinda shitty." **Bobby BELLAMY** replied, "They were shitty because you had that shit in your system." The call was later terminated. It is believed by your Affiant that during this conversation, **Bobby BELLAMY** and **RAMIREZ** discussed **RAMIREZ's** use of ecstasy ("beans").

87.        On August 3, 2002, at approximately 3:16 PM. , **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2081, to telephone number (321) 217-4266. During the conversation, **Bobby BELLAMY** told **Ainsworth BROWN**, "I got someone who wants a big eight and a nine." **Ainsworth**

88

BROWN replied, "Alright." **Bobby BELLAMY** then said "Just give me an hour or something." The call was later terminated. It is believed by your Affiant that based upon the above conversation **Bobby BELLAMY** was discussing future cocaine transactions with **Ainsworth BROWN**. It is believed that **Bobby BELLAMY** is telling **Ainsworth BROWN** that he **(BELLAMY)** has a customer who wants a big eight (multiple ounces of cocaine) and a nine (a 1/4 kilo of cocaine).

88.      On August 3, 2002, at approximately 10:28 PM. , **Bobby BELLAMY** utilizing Subject Telephone 1, placed an outgoing telephone call, call # 2194, to telephone number (407) 375-4800. This telephone number is subscribed to Gillis Brummitt. Investigation has identified the user of this phone as Gillis Brummitt. During the conversation, Gillis Brummitt told **Bobby BELLAMY,** "I got that sand." **Bobby BELLAMY** responded, "Alright." Brummitt then told **Bobby BELLAMY,** "I had that spoon and I got rid of it." **Bobby BELLAMY** then asked, "You ain't got nothing now?" Brummitt responded, "I got that sand." **Bobby BELLAMY** then told Brummitt, "Don't mess with it." The call was later terminated. It is believed by your Affiant that during this conversation, **Bobby BELLAMY** asked Brummitt what drugs Brummitt had distributed for **Bobby BELLAMY** and Brummitt replied that he (Brummitt) had distributed a spoon, which is believed to be a small amount of cocaine. It is believed that Brummitt told **Bobby BELLAMY** that he still possessed powder cocaine ("sand") at that time.

89.      On August 3, 2002, at approximately 10:30 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2195, from

89

telephone number (321) 231-5582. The subscriber for this telephone number is unknown and the actual user has yet to be fully identified.  During the telephone call, **Bobby BELLAMY** called the unknown male "Shane".  **Bobby BELLAMY** asked  Shane LNU, "What you have needed Shane?"   Shane LNU responded, "Like 11 or 12."  **Bobby BELLAMY** then said, "I got eight of them for you man."   Shane LNU then told **Bobby BELLAMY**,  "That's fine. That works. That works."  Also during the telephone call, Shane LNU told **Bobby BELLAMY** that the customers were important people from two areas outside of Orlando, Palm Coast, and Tampa.  Shane LNU and **Bobby BELLAMY** then agreed to meet later.  The call was then terminated.  It is believed by your Affiant that during the conversation **Bobby BELLAMY** and "Shane" LNU discussed a future drug transaction.  "Shane" LNU asked  **Bobby BELLAMY** for 11 or 12 ounces of cocaine and **Bobby BELLAMY** replied that he had eight ounces of cocaine available.

90.         On August 3, 2002, at approximately 10:28 PM. , **Bobby BELLAMY** utilizing Subject Telephone 1, received a  telephone call, call # 2199, from telephone number (407) 375-4800.    During the conversation, Gillis Brummitt asked **Bobby BELLAMY**,  "You got some ready right now for that boy?"   **Bobby BELLAMY** asks, "Who?" Brummitt then said, "I got somebody here right now. "  **Bobby BELLAMY** told Brummitt, "Yeah. It's already ready but I ain't got it with me." Brummitt replies "Oh shit." **Bobby BELLAMY** then  told Brummitt, "You got to ride to Kris' house with me." Brummitt replied, "Alright Bobby. Whatever you say. You the captain."  **Bobby BELLAMY** replied" Alright."  The call was later terminated.  It is believed by your Affiant that during the

conversation Gillis Brummitt told **Bobby BELLAMY** that he had a drug customer ready and **Bobby BELLAMY** responded that he did not have the drugs with him at that time. **Bobby BELLAMY** then told Brummitt that Brummitt had to ride to **Kristina GUSE's** house with him (**BELLAMY**) to pick up the drugs at **GUSE's**.

91.    On August 3, 2002, at approximately 11:54 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2228, to telephone number (407) 808-1127. The subscriber for this telephone number is Isabell Gamble and the user of this telephone facility has been identified as **Albert HOPKINS**. During the conversation, **Bobby BELLAMY** told **HOPKINS**, "Kris is gonna give it to you". **HOPKINS** replied "O.K." **Bobby BELLAMY** then told **HOPKINS**, "I'm leaving you a piece outside the bag." **HOPKINS** replied "O.K." The call was later terminated. It is believed by your Affiant that during the conversation **Bobby BELLAMY** told **HOPKINS** that **Kristina GUSE** would provide an unknown amount of cocaine to **HOPKINS** and that **Bobby BELLAMY** would leave a piece of the cocaine outside the bag for **HOPKINS**.

92.    On August 3, 2002, at approximately 11:54 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2286, to telephone number (407) 230-5218. The subscriber for this telephone number is Michael Grant and one of the users of this telephone facility has been identified as **Toney DUNKLEY**. During the conversation, **DUNKLEY** left the following message on the answering machine of **Bobby BELLAMY**, "This is Toney man. What the fuck man. Pick up your phone man. It's been too long though. You told me the other night you had my

money man. Come on dog. You know what I mean." The call was then terminated. It is believed by your Affiant that **DUNKLEY** left a message for **Bobby BELLAMY** demanding money owed to **DUNKLEY** for drugs previously provided to **Bobby BELLAMY** by **DUNKLEY.**

93.     On August 4, 2002, at approximately 5:02 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2335, to telephone number (407) 616-4284. During the conversation, **Bobby BELLAMY** told **Texas GOBERN**, "I got that white lady." **GOBERN** responded, "You plentiful. Cause I'm straight right now." **Bobby BELLAMY** then said "Yeah. I got like two big eights left so I'm just hollering at you." **GOBERN** replied, "Alright. I'll probably need a little something tomorrow." The call was later terminated. It is believed by your Affiant that during the conversation **Bobby BELLAMY** told **GOBERN** that he (**BELLAMY**) had cocaine available and **GOBERN** replied that he might need some cocaine tomorrow.

94.     On August 4, 2002, at approximately 5:58 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2348, from telephone number (407) 467-4904. During the conversation, **Bobby BELLAMY** asked **Paul Demitrius SMITH**, "Where you at Paul?" **SMITH** replied, "Home." **Bobby BELLAMY** then asked **SMITH**, " 'AJ' over there?" **SMITH** responded, "No. They went somewhere." **Bobby BELLAMY** told **SMITH** later in the conversation , "That nigger stole some of my dope man." **SMITH** replied, "Na Ah." **Bobby BELLAMY** then said, "Yeah man. A lot of my shit man. I thought I had enough man." **SMITH** replied, "Oh shit ...

You're sure that was him?" **Bobby BELLAMY** replied, "He's the only one man. I had that shit sealed up and vacuumed in my damn thing man. He'd be in all through my closet searching for my shit. " **SMITH** responded, "Oh." **SMITH** next talked to an unknown female in the background and then told **Bobby BELLAMY,** "Yeah, I guess they're at Cocoa Beach." The call was then disconnected. On this same date, at approximately 6:07 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2352, from telephone number (407) 467-4904. During the conversation, **SMITH** told **Bobby BELLAMY,** "Hey, I got a number." **Bobby BELLAMY** replied, "What number?" **SMITH** then said, "407." **Bobby BELLAMY** asked, "To what?" **SMITH** then said, "It just says 'AJ'." **Bobby BELLAMY** replied, "407 what?" **SMITH** then said, "257-0449". At this point it is believed that **SMITH** conducted a three-way call with **SMITH** calling 407-257-0499 and **Bobby BELLAMY** listened to the call. During the three-way call, **SMITH** asked a female subsequently identified as Jahaira Walker, "Where you all at?" Walker responded, "Why you ask me?" **SMITH** told Walker, "I have a problem. Where you at?" Walker replied, "In Daytona." **SMITH** then asked, "Where at?" Walker told **SMITH,** "In a motel." Walker later in the conversation told **SMITH,** "Saxony, you come up A1A. Right in the back of 7-11. Right on the beach." At approximately 6:57PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2357, from telephone number (407) 467-4904. During this call, **Bobby BELLAMY** told **SMITH** that BELLAMY as "up here". **SMITH** told **BELLAMY,** "Alright, we're about ready to come now." At approximately 7:27 PM, **Bobby BELLAMY** utilizing the Subject

93

Telephone 1, received an incoming telephone call, call #2360, from telephone number (407) 948-5414. The subscriber for this telephone number is Fine Grade, Inc. During the conversation, **Bobby BELLAMY** told an unknown male, "I got to go on a mission now. Somebody stole something. Somebody stole something from me man and I got to go get it. So call my brother, alright?" On August 4, 2002, subsequent to the above noted intercepted telephone calls, DEA agents responded to the Saxony Motel in Daytona Beach, Florida and verified that **Aubrey BROWN** (a/k/a "A.J.") was presently with Walker at the hotel. At approximately 9:53 PM, the Daytona Beach Police arrested **Aubrey BROWN** at the Saxony Motel in Daytona Beach for possession of approximately 7 grams of cocaine, 6 tablets of ecstasy, and a trace amount of marijuana (all drugs seized from **Aubrey BROWN's** person). The officers searched and entered **BROWN's** room based upon consent from **BROWN** who was the registered guest of the motel room. Jahaira Walker was also present in the motel room at the time of arrest but was not charged with any criminal offense. It is believed by your Affiant that based upon the above series of conversations and arrest that **Aubrey BROWN** stole an undetermined amount of drugs from **Bobby BELLAMY**. It is also believed that **SMITH** assisted **Bobby BELLAMY** in locating **Aubrey BROWN** and that **Bobby BELLAMY, SMITH,** and possibly others were en route to the Daytona Beach motel to confront **Aubrey BROWN** about the stolen drugs and recover same.

95.    On August 4, 2002, at approximately 6:03 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2351, from

94

telephone number (407) 238-2820. The subscriber for this telephone number is unknown. Investigation has identified the user of this telephone number during this conversation as **Ray ABLE**. During the conversation, **Bobby BELLAMY** said, "What up Dred?" **ABLE** then said, "Bob, why you dealing me like this man?" **Bobby BELLAMY** told **ABLE**, "I had to get my money back because the shit was no good ... I had a shootout. I had to shoot a nigger twice last night man." **ABLE** said, "Oh." **Bobby BELLAMY** then told **ABLE**, "I can't even go to my own house right now man. I'm hiding out in Winter garden right now man ... I don't know if the nigger called the police or nothing. I doubt he called the police. I got to wait till the morning to see my bondsman and tell him to check the computer and see if I have a warrant or anything man. Then I snuck to my house last night and the shit I had at my house my boy done went in and took half of my dope I had in my house man." **ABLE** then asked, "Who that?" **Bobby BELLAMY** replied, "The little black dude 'AJ' man that lived with me man." **ABLE** then asked, "'AJ'?" and **Bobby BELLAMY** replied, "Yeah." **Bobby BELLAMY** replied "Huh?" and then said "I have one of those vacuum sealer things. You can seal your shit air tight. That way the dogs can't smell it." **ABLE** told **Bobby BELLAMY** later during the conversation, "One of them people want to give me one and a half. " **Bobby BELLAMY** replied, "How much do you need Dred?" **ABLE** told **Bobby BELLAMY**, "Give them like 10 G's." **Bobby BELLAMY** then asked, "You have like 4?" and **ABLE** replied "Yeah." The call was later terminated. It is believed by your Affiant that during the conversation that **Bobby BELLAMY** told **ABLE** that he shot an unknown person twice the night before and was concerned whether there was a warrant outstanding for

95

him. It is believed **Bobby BELLAMY** then discussed **Aubrey BROWN, a/k/a 'AJ'**, stealing **BELLAMY**'s drugs. Later in the conversation, **ABLE** told **Bobby BELLAMY** that someone wanted to give him (**ABLE**) one and a half kilograms of cocaine and **ABLE** then instructed **Bobby BELLAMY** to give the unknown individuals $10,000.00 for the cocaine.

96.        On August 5, 2002, at approximately 2:37 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2513, to telephone number (407) 657-2931. The subscriber for this telephone number is unknown. During the conversation, the unknown male asked **Bobby BELLAMY**, "what happened with all that stuff?" **Bobby BELLAMY** replied, "They got all my dope and all my pills and shit." The unknown male then asked, "Where are they?" **Bobby BELLAMY** responded, "Shit 'AJ' was in Daytona before me and 'P-Diddy' could get there." The call was later terminated. It is believed by your Affiant that during the conversation, **Bobby BELLAMY** and the unknown male were discussing the arrest of **Aubrey BROWN** in Daytona Beach, FL on August 4, 2002, and the attempt to recover the stolen drugs from **BROWN** by **Bobby BELLAMY** and **Paul Demitrius SMITH** (referred to by the nickname "P Diddy").

97.        On August 5, 2002, at approximately 2:34PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2512, to telephone number (407) 595-5520. During this call, **Bobby BELLAMY** talked to **Joe BELLAMY** about "AJ" (referring to **Aubrey BROWN**) getting arrested in Daytona Beach, Florida. On this dame date, at approximately 2:45 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2513, to telephone number

96

(407) 657-2931. During the call, **Bobby BELLAMY** told **Erica RAMIREZ** about how "AJ" (referring to **Aubrey BROWN**) got arrested "yesterday" and discussed how **BROWN** had stolen all of **BELLAMY**'s "drugs and pills". Your affiant believes that during this conversation, **BELLAMY** discussed with **RAMIREZ** the arrest of **BROWN**, who had been arrested in possession of **BELLAMY**'s cocaine and ecstasy tablets. At approximately 2:45 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2514, to telephone number (407) 595-7741. The subscriber for this telephone number is **Sheldon JOHNSON** and the user of this telephone facility has been identified as **Sheldon Jerrod JOHNSON**. During the conversation, **Bobby BELLAMY** told **JOHNSON**, "I know I had been missing shit man." **JOHNSON** then asked, "What he stole from you boss?" **Bobby BELLAMY** replied, "About two ounces man." The call was later terminated. It is believed by your Affiant, based upon the above conversation, that **Bobby BELLAMY** told **JOHNSON** that **Aubrey BROWN** stole two ounces of cocaine from him (**BELLAMY**). At approximately 2:57 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2516, to telephone number (305) 490-2818 and spoke to **Ray ABLE**. During the call, **Bobby BELLAMY** told **ABLE** about the police taking his "dope and X pills in Daytona yesterday", then explained that "AJ" (referring to **Aubrey BROWN**) had stolen them. The conversation continued about **ABLE** collecting money from **BELLAMY** later in the day and was then terminated. Your affiant believes that during this conversation, **BELLAMY** discussed with **ABLE** the arrest of **BROWN**, who had been arrested in possession of **BELLAMY**'s cocaine and ecstasy tablets.

97

98.         On August 6, 2002, at approximately 3:01PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2759, to telephone number (407) 657-2931 and spoke to **Erica RAMIREZ**. **BELLAMY** told **RAMIREZ**, "Call over there right now". **RAMIREZ** replied, "What if they ask me why?" **BELLAMY** told **RAMIREZ** to say that one of **BELLAMY's** friends had "stole some shit" from **BELLAMY** and that **BELLAMY** went down and jumped on him (reference to A.J.) and **BELLAMY** jumped on him (A.J.) and he (A.J.) went to jail too for "the substance". **BELLAMY** told **RAMIREZ**, "Tell them A.J., they'll know". **RAMIREZ** replied, "Alright". At approximately 3:04PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2760, to telephone number (407) 657-2931. During this call, **RAMIREZ** told **BELLAMY** that she got a message on the "first one" and the "second one" is disconnected. **RAMIREZ** asked **BELLAMY** if he wanted her to leave a message on the "first one" and **BELLAMY** told her "yes". At approximately 3:06PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, made an outgoing telephone call, call #2762, to telephone number (407) 657-2931. During this call, **BELLAMY** told **RAMIREZ** to change the "321-946" number to "230-5218". **RAMIREZ** again told **BELLAMY** that she had left a message on the "first one". At approximately 3:08PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2763, from telephone number (407) 657-2931. During this call, **RAMIREZ** told **BELLAMY** that the number was not in service. **BELLAMY** told her to call area code (407), not (321), and to try again. At approximately 3:12PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an

incoming telephone call, call #2764, from telephone number (407) 657-2931. During this call, **RAMIREZ** told **BELLAMY** that she had spoken with the "guy" and that she forwarded the message that **BELLAMY** was in jail. **RAMIREZ** stated that she told the "guy" that **BELLAMY** would be getting out of jail later in the evening. **BELLAMY** later replied, "He's a Jamaican and a little slow". The conversation was then terminated. Your Affiant believes, based upon this series of telephone conversations, that **RAMIREZ** had agreed to assist **BELLAMY** in talking to one of **BELLAMY**'s Jamaican cocaine sources, **Toney DUNKLEY**. During the oral intercept as noted above, **DUNKLEY** has been identified as using two telephone facilities, (321) 946-7561 and (407) 230-5218, which **BELLAMY** and **RAMIREZ** discussed. Based upon the investigation conducted up to this point in time, your Affiant believes that **BELLAMY** owed **DUNKLEY** monies for cocaine previously delivered by **DUNKLEY** to **BELLAMY** and that **BELLAMY** was attempting to avoid contact with **DUNKLEY**. Based upon **BELLAMY**'s request, **RAMIREZ** talked to **DUNKLEY** in order to give **BELLAMY** additional time to collect drug money in order to compensate **DUNKLEY**.

99. On August 6, 2002, at approximately 5:36PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2792, from telephone number (407) 312-4283 and spoke to **Jerry Vega ORTIZ**. During the call, **ORTIZ** told **BELLAMY**, "It's back to nine, back to normal". **ORTIZ** told **BELLAMY** that **ORTIZ** was just letting **BELLAMY** know as he was calling "everybody because things were changing". **BELLAMY** asked, "Are they the good ones?" to which **ORTIZ** replied, "Oh Yeah ... they are the fishies, the double stacks". The call was later terminated. Your Affiant believes that

during this conversation, **ORTIZ** told **BELLAMY** that **ORTIZ** was now capable of supplying **BELLAMY** and others with ecstasy tablets for a price of $9 per tablet. **ORTIZ** utilized the same code terminology in referring to the ecstasy tablets ("fishies, the double stacks") that **BELLAMY** used in another intercepted telephone conversation (call# 939 with "Jimmy" LNU as noted above).

100.    On August 6, 2002, at approximately 7:02PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #2809, to telephone number (407) 616-4284 and spoke to **Texas Arnell GOBERN.** During the call, **BELLAMY** told **GOBERN,** "I got that white lady ... are you still straight?" **GOBERN** replied, "Yeah" and **BELLAMY** said, "Alright".    On August 9, 2002, at approximately 5:16PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3432, from telephone number (407) 616-4284 and spoke to **Texas Arnell GOBERN.** During the call, **GOBERN** asked **BELLAMY,** "Do you still have some more of that?" **BELLAMY** then told **GOBERN,** "Yeah, in a minute ... it won't take long, give me a minute". **GOBERN** replied, "Alright". Your affiant believes that during call#2809, **BELLAMY** told **GOBERN** that **BELLAMY** had cocaine available for sale and **GOBERN** stated that he already had some or was not ready to complete the purchase. During call #3432, **GOBERN** called **BELLAMY** to ask **BELLAMY** for an unknown quantity of cocaine that **GOBERN** was ready to purchase from **BELLAMY** and **BELLAMY** told **GOBERN** that **BELLAMY** needed a little more time to obtain the cocaine.

101.    On August 6, 2002, at approximately 11:03PM, **Bobby BELLAMY**

utilizing the Subject Telephone 1, received an incoming telephone call, call #2881, from telephone number (407) 797-4473. The subscriber to the telephone number is unknown and the user of the facility during the following conversation is also unknown at this time. During the conversation, **BELLAMY** told the unknown male that **BELLAMY** "got only a little lick from "Tone-Tone" because **BELLAMY's** "people didn't come through tonight". Later in the conversation, **BELLAMY** asked the unknown male if he messed with "Willie", who lives around the corner from **BELLAMY's** mother's house. **BELLAMY** stated that "Willie" had "soft" and then specified the full name of "Willie" as **Willie MURPHY**. **BELLAMY** told the unknown male to give **MURPHY** a try. Your Affiant believes that **BELLAMY** told the unknown male during this conversation that **BELLAMY** did not have cocaine to supply to the male. **BELLAMY** referred the male to another cocaine-related associate, **Willie MURPHY**, who according to **BELLAMY**, had soft cocaine available for sale.

102.    On August 7, 2002, DEA and MBI agents utilized CS-2 to complete a controlled purchase of crack cocaine from **Patrick PERRY**. After negotiating with **PERRY** regarding the purchase of the crack cocaine, **PERRY** instructed CS-2 to meet **PERRY** at the Pinehurst Apartments, located at the intersection of Texas Avenue and Oak Ridge Road, Orlando, Florida, in order to consummate the drug transaction. On this same date, agents observed CS-2 enter the premises located at **2152 Oak Ridge Drive, Apartment C, Orlando, Florida 32809** (Pinehurst Apartments). Prior to entering the apartment, agents searched CS-2's person and vehicle for drugs, money, and other contraband items; no such items were found. CS-2 was then provided with $2,400.00 of pre-recorded

investigative funds to be used to purchase the crack cocaine from **PERRY**, in addition to a recording device. CS-2 was then continuously followed and observed to enter the aforementioned apartment. According to CS-2, as also depicted on the recording which depicts the meeting with **PERRY**, **PERRY** provided three crack cocaine "cookies" to CS-2 in the kitchen area of the apartment, in exchange for the $2,400.00. Also present with **PERRY** on this occasion was a light skinned unknown black female. After the completion of the crack cocaine purchase, CS-2 exited from the premises located at **2152 Oak Ridge Drive, Apartment C, Orlando, Florida**, and was continuously surveilled by agents to another location. At this time, agents again searched CS-2 for drugs, money, and other contraband items. During this search, agents seized the three crack cocaine "cookies"; no other items were found. SA Jeff Harmon later transported the three crack cocaine "cookies", wrapped in a paper towel and contained within a brown paper bag, to the DEA Orlando office. The three crack cocaine "cookies" were found to weigh approximately 61 grams (net weight) and a field test produced positive results for the presence of cocaine. This crack cocaine is pending formal analysis by the DEA laboratory in Miami, Florida.

103. On August 7, 2002, at approximately 2:55 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2963, from telephone number (407) 595-7741. This telephone is subscribed to **Sheldon JOHNSON** but the user of the telephone facility on this particular occasion was **Donea FUSON**. **FUSON** has been identified as the girlfriend of **Aubrey BROWN**. During this call, **FUSON** asked if **BELLAMY** had spoken to "Krissy" (reference to Kristina Ann **GUSE**) and **BELLAMY** said "no".

FUSON told **BELLAMY** that **GUSE** probably would not be able to call **BELLAMY** until tomorrow, as **GUSE** was traveling from one city to another in Minnesota. **FUSON** then told **BELLAMY** that **BELLAMY** should "get everything out of the house" because of "that Jeff guy". **FUSON** continued, but first asked **BELLAMY** if she should tell him over the phone. **BELLAMY** told **FUSON** to "go ahead". **GUSE** then told **BELLAMY** that the police had been watching **BELLAMY** "hard", and had been watching "that house". **FUSON** again warned **BELLAMY** to "get everything out of the house". The conversation was later terminated. Your affiant believes that during this call, **FUSON** was warning **BELLAMY** about the police conducting surveillance of **BELLAMY** and his residence located at **5925 Danube Way**. Your Affiant further believes that **FUSON** had received information pertaining to the surveillance by police of **BELLAMY** following the arrest of **Jeffrey GREATHOUSE** ("that Jeff guy") and warned **BELLAMY** to remove the illegal drugs ("get everything out of the house") from **BELLAMY**'s residence.

104.    On August 7, 2002, at approximately 5:08PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #2993, from telephone number (407) 407-9051. The subscriber to this telephone number is unknown and the user of the facility on this occasion is also unknown at this time. During the call, **BELLAMY** spoke with an unknown female. **BELLAMY** told the female about "A.J." (referring to **Aubrey BROWN**) getting arrested. **BELLAMY** also discussed with the female about "selling a brick for Patrick". **BELLAMY** stated that "Patrick" had **BELLAMY** bring the money up to the gas station and **BELLAMY** gave the money to "Patrick". **BELLAMY** told

the female that "Patrick's lady" was supposed to give **BELLAMY** "the brick" but she pulled off and then "Patrick" wouldn't answer his ("Patrick's") phone. The conversation continued and was later terminated. Your affiant believes that **BELLAMY** informed the unknown female of **Aubrey BROWN** arrest. Further, **BELLAMY** told the female about **BELLAMY's** attempt to purchase one kilogram of cocaine from "Patrick", identified in this investigation as **Patrick Anthony HUGHES**, during the evening of August 1, 2002 as referenced above.

105.        On August 8, 2002, at approximately 2:05 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3116, from telephone number (407) 616-4284. During the ensuing conversation, **Texas GOBERN** asked **BELLAMY** if **BELLAMY** still had "that". **BELLAMY** told **GOBERN**, "Yeah". **GOBERN** then informed **BELLAMY** that **GOBERN** wanted to get four and a half". **BELLAMY** told **GOBERN** to give **BELLAMY** a few minutes and that **BELLAMY** would get back to **GOBERN** later. Your Affiant believes that during this call, **GOBERN** asked if **BELLAMY** any cocaine ("that") and then informed **BELLAMY** that **GOBERN** wanted to purchase 4 ½ ounces of cocaine. **BELLAMY** told **GOBERN** that **BELLAMY** would call later once **BELLAMY** had the cocaine to deliver to **GOBERN**.

106.        On August 8, 2002, at approximately 2:35 PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3127, from telephone number (407) 595-7741. During the ensuing conversation, **Sheldon JOHNSON** told **Bobby BELLAMY** that they had to find a way to get "some D" from somebody. **JOHNSON** told **BELLAMY** that **BELLAMY** had to give **JOHNSON** some money or

something. **BELLAMY** told **JOHNSON** that nobody had any "D". **JOHNSON** then offered to buy "some" from anybody, just so they could "keep rolling". **JOHNSON** told **BELLAMY** that **BELLAMY** could buy an "ounce or something" and to just think about it. Your Affiant believes that during this call, **JOHNSON** was encouraging **BELLAMY** to find a way to purchase drugs ("D") so that they could make some money and continue their drug trafficking lifestyle.

107.     On August 8, 2002, at approximately 11:19AM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #3096, to telephone number (321) 795-8150. The investigation has revealed that the subscriber of that telephone number is Terri Branch and the user of that telephone is **Courtney BRADLEY**. During the ensuing conversation, **BRADLEY** informed **BELLAMY** that her friend wanted her to get "fifty six of them". **BELLAMY** told **BRADLEY** that **BELLAMY** did not have "them" yet and would possibly have "them" by 4PM. On this same date, at approximately 1:40PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3114, from telephone number (321) 795-8150. **BRADLEY** asked if **BELLAMY** had talked to **BELLAMY's** "friend" yet and **BELLAMY** told **BRADLEY** to give him a few minutes and that **BELLAMY** would call her back.   At approximately 2:12PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3118, from telephone number (407) 312-4283, a cellular telephone subscribed to Jason Rivera. Investigation in this matter has identified the user of this telephone facility as **Jerry Vega ORTIZ**. During this telephone conversation, **BELLAMY**

105

informed **ORTIZ** that **BELLAMY** needed to see **ORTIZ** for "fifty" right now.    At approximately 2:12PM (immediately following the conversation with **ORTIZ**), **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #3119, to telephone number (321) 795-8150.    **BELLAMY** informed **BRADLEY** that **BELLAMY** was waiting on her and that "the guy" was waiting on **BELLAMY**.  **BELLAMY** told **BRADLEY** that **BELLAMY**'s money was tied up, and **BRADLEY** agreed to ride together with **BELLAMY** to go get "them".    **BRADLEY** asked **BELLAMY**, "How much does he charge?" **BELLAMY** replied,  "probably like ... just for four-fifty I think.  I think I can get them for nine." **BRADLEY** told **BELLAMY**, "I'm getting it from this guy who always give me Xanax, but sometimes he tries to hustle me ... to make money off me ... I'm gonna get his money, he wants fifty and I want six for myself". **BRADLEY** then told **BELLAMY** that she should come over to **BELLAMY**'s house with all the money and then they could go get "them" together. Next, **BRADLEY** asked **BELLAMY**, "Can you sell me those fifty for eight dollars so I can make fifty off it?" **BELLAMY** replied, "No, that's the cheapest way he'll do it".  Following additional telephone calls involving **BELLAMY, BRADLEY,** and **ORTIZ** (which were also intercepted and recorded), all three individuals are observed by agents meeting at a location on Orange Blossom Trail, Orlando, Florida.  During this meeting, agents observed **BRADLEY** counting out money, then **BELLAMY** met with **ORTIZ** and **ORTIZ** provided **BELLAMY** with a small package. **BELLAMY** then re-entered **BRADLEY**'s vehicle and both vehicles departed the area, separately.  Following the meeting as noted above, at approximately 5:30PM,  **Bobby BELLAMY** utilizing the Subject Telephone 1,

received an incoming telephone call, call #3163, from telephone number (321) 795-8150. During the ensuing conversation, **BRADLEY** complained that she had received only "forty", and mentioned that she had counted the pills twice. **BRADLEY** told **BELLAMY**, "I thought that was your boy". **BELLAMY** responded, "He is my boy". **BELLAMY** then told **BRADLEY** that **BELLAMY** thought he had seen "five, ten packs" and that each "pack" was supposed to "have ten, rolled up". **BRADLEY** told **BELLAMY** that there were not "five, ten packs" and that there were only "forty beans". **BELLAMY** told **BRADLEY** that he would call real quick. **BRADLEY** replied, "Call because he has our money and I want my beans". At approximately 5:31PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #3165, to telephone number (407) 312-4283. During the ensuing conversation, **BELLAMY** told **ORTIZ** that **ORTIZ** had given **BELLAMY** the "wrong bag". Later in the call, **ORTIZ** told **BELLAMY**, "I got you man, I knew I mis-counted one bag". **ORTIZ** then stated, "I shoot down that way for the mistake, give me a few minutes...". Subsequent to this telephone call, surveillance agents observed **ORTIZ** arrive at **BELLAMY**'s residence, **5925 Danube Way, Orlando, Florida**, in a Lincoln Navigator. At approximately 6:59PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3184, from telephone number (321) 795-8150. During this conversation, **BELLAMY** informed **BRADLEY** that he had "it" at his house now. **BRADLEY** then arranged with **BELLAMY** for a friend of her's, identified by **BRADLEY** as "Josh", pick up the rest of "them". Based on this series of telephone conversations and the related observations by surveillance agents, your Affiant believes that **ORTIZ** provided

BELLAMY with ecstasy tablets on this occasion, which were then provided to BRADLEY. After the ecstasy sale had been completed, BRADLEY contacted BELLAMY and complained that she had not received the proper number of ecstasy tablets for which she had paid for, and BELLAMY then arranged with ORTIZ to obtain additional ecstasy tablets to make up for the shortage. During the initial telephone conversations, BELLAMY told BRADLEY that ORTIZ normally provided BELLAMY with ecstasy tablets for a price of $9.00 per tablet and BRADLEY asked if she could purchase the tablets for a price of $8.00 per tablet so she could make a profit during the resale of the ecstasy tablets. During one of the calls, BRADLEY used the code language of "beans" when referring to the ecstasy pills. Your Affiant has learned through interviews or debriefings of convicted ecstasy traffickers that ecstasy is commonly referred to as "beans".

108.        On August 8, 2002, at approximately 9:05PM, Bobby BELLAMY utilizing the Subject Telephone 1, received an incoming telephone call, call #3236, from telephone number (321) 217-1899.    The subscriber to this telephone number is unknown and investigation has not yet identified the user of this telephone facility. During the time BELLAMY's phone was ringing, an unknown female can be heard in the background, talking to another person. The female stated, "I want to call Bobby and get me some pills. I'll go out with him. Give me two ecstasy pills...". The female reached BELLAMY's voice mail and did not leave any message.

109.        On August 8, 2002, at approximately 2:56PM, Bobby BELLAMY utilizing the Subject Telephone 1, placed an outgoing telephone call, call #3130, to telephone

108

number (407) 230-5218.   This telephone number is subscribed to Michael Grant, and investigation has identified **Toney DUNKLEY** as the user of this telephone facility.  During the ensuing conversation, **DUNKLEY** informed **BELLAMY** that **DUNKLEY** was in Daytona. **BELLAMY** asked **DUNKLEY** to call later, then told **DUNKLEY**, "I have people waiting". **BELLAMY** further told **DUNKLEY** that **BELLAMY** had a lot of people to catch and was trying to do something.   After **DUNKLEY** asked **BELLAMY** what he had just said, **BELLAMY** stated, "I am trying to make some money to help you out."  **BELLAMY** then informed **DUNKLEY** that **DUNKLEY** could come to **BELLAMY**'s mother's house. **DUNKLEY** replied, "Alright, see you in a little bit".   On this same date, at approximately 4:04PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3145, from telephone number (407) 808-1127.   During this conversation, **BELLAMY** told Albert **HOPKINS** that **BELLAMY** was waiting on "my boy to get from Daytona" and **BELLAMY** would then "have something".   **HOPKINS** told **BELLAMY**, "Alright".   At approximately 4:17PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3146, from telephone number (407) 595-5520. During this conversation, **Joe BELLAMY** asked **Bobby BELLAMY** if he was "tightened up yet".  **Bobby BELLAMY** then informed **Joe BELLAMY** that he was waiting on "my boy now, coming from Daytona".  **Bobby BELLAMY** then told **Joe BELLAMY** that **Bobby BELLAMY** would have "something in a little bit".  **Joe BELLAMY** told **Bobby BELLAMY**, "Alright".   At approximately 7:25PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, received an incoming telephone call, call #3191, from telephone

number (407) 230-5218.    During this conversation, **Toney DUNKLEY** told **Bobby BELLAMY**, "the lady didn't get stuff last night" and, consequently, all **DUNKLEY** had was "the pretty brown".    **DUNKLEY** asked if **Bobby BELLAMY** wanted to "work with that".  **Bobby BELLAMY** asked **DUNKLEY** if "it" looked alright and asked if "it" was "dry".  **DUNKLEY** told **Bobby BELLAMY**, "Yeah, this is totally different".  **Bobby BELLAMY** then told **DUNKLEY** to meet at **Bobby BELLAMY**'s mother's house.  At approximately 7:45PM, **Bobby BELLAMY** utilizing the Subject Telephone 1, placed an outgoing telephone call, call #3198, to telephone number (407) 230-5218.    During this conversation, **Bobby BELLAMY** told **DUNKLEY** that he was sitting in his mom's front yard.  **DUNKLEY** replied that he would be there in five minutes.    Based on this series of telephone conversations, your Affiant believes that **Bobby BELLAMY** told **DUNKLEY** that **BELLAMY** had cocaine customers "waiting" and that **Bobby BELLAMY** wanted to obtain an unspecified quantity of cocaine from **DUNKLEY**, who at the time was in Daytona.    Following the first conversation with **DUNKLEY**, **Bobby BELLAMY** informed **Albert HOPKINS** that his "boy" (referring to **DUNKLEY**) was in Daytona.  Your Affiant believes that **HOPKINS** was checking with **Bobby BELLAMY** relative to the availability of cocaine.  Thereafter, **Joe BELLAMY** asked if **Bobby BELLAMY** had any cocaine ("tightened up yet") and **Bobby BELLAMY** told **Joe BELLAMY** that his "boy" (again referring to **DUNKLEY**) was in Daytona.  Your Affiant believes that **Joe BELLAMY** was checking with **Bobby BELLAMY** relative to the availability of cocaine.  Later during the evening, **DUNKLEY** informed **Bobby BELLAMY** that the "lady" (referring to **DUNKLEY**'s source of supply for cocaine) had not

yet received cocaine and all **DUNKLEY** had to supply **Bobby BELLAMY** at the moment was cocaine that was brown or off-white in color ("pretty brown"). **Bobby BELLAMY** then questioned **DUNKLEY** if this particular brown cocaine was dry, because of **Bobby BELLAMY**'s past inability to sell brown cocaine that was wet. **DUNKLEY** told **Bobby BELLAMY** that this brown cocaine was dry and both agreed to consummate the cocaine transaction at the residence of **Bobby BELLAMY**'s mother, located at **7611 Ferrara Avenue, Orlando, Florida.**

110.    During this investigation, agents have determined that **Patrick Anthony HUGHES** is a Jamaican male with a date of birth of June 23, 1967. **HUGHES** has utilized an alias name of Harry McLeod with an associated date of birth of May 31, 1969 and a social security number of 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. According to NCIC records, **HUGHES** was convicted on 02/20/1991 of Importation of Cocaine and Possession with Intent to Distribute Cocaine. Following this drug conviction, according to information obtained from the Immigration and Naturalization Service, **HUGHES** was deported from the United States to Jamaica and has not been permitted legal re-entry into the United States. Your Affiant has compared the arrest photographs taken of **HUGHES**, during **HUGHES'** 1990 drug arrest and a 1999 arrest of Harry McLeod for Reckless Driving in Orange County. Your affiant has also reviewed the Florida Driver's License photograph of Harry McLeod, #M242-360-69-191-0, issued on 02/27/1998 by the Florida Department of Highway Safety and Motor Vehicles. Orange County Sheriff's Office personnel have previously established that **Patrick HUGHES** and Harry McLeod are the same person, in relation to the arrests of

HUGHES and McLeod. Based on these photograph and fingerprint comparisons, it has been determined that **HUGHES** and McLeod are the same person. Thus, your Affiant believes that **HUGHES** re-entered the United States illegally and is presently using a fictitious name of Harry McLeod.

111.    During this investigation, agents have determined that **Ray ABLE** has utilized an alias name of Victor Fogo with an associated date of birth of May 9, 1973. According to NCIC records, **ABLE** has a drug-related conviction on or about 06/02/1999 subsequent to an arrest by the New York Police Department and was placed on 4 years probation. NCIC records indicate that **ABLE** is presently wanted as a fugitive in New York related to a probation violation in this matter. On August 9, 2002, a fingerprint specialist of the Orlando Police Department compared the known fingerprints of **Ray ABLE** with the thumb prints of "Victor Fogo" which were taken on July 25, 2002 during the contact with the Osceola County Sheriff's Office. The fingerprint specialist determined that **ABLE** and Fogo are the same person.

112.    On August 12, 2002, based on intercepted communications involving **Bobby BELLAMY** and **Ray ABLE**, agents responded to **BELLAMY**'s residence, **5925 Danube Way, Orlando, Florida**. At approximately 4:30PM, **ABLE** was observed to arrive at **BELLAMY**'s residence. After **ABLE** departed the residence, agents followed **ABLE** and arranged to conduct a traffic stop of **ABLE** utilizing Orlando Police marked units. Upon contacting **ABLE**, **ABLE** was placed under arrest based upon probable cause to believe that **ABLE** had committed violations related to the Possession With Intent to Distribute

Cocaine, in violation of Title 21, USC, 841(a)(1). This arrest was done in conjunction with the outstanding fugitive warrant out of New York. On August 13, 2002, United States Magistrate Karla Spaulding issued an arrest warrant for Ray ABLE (a/k/a Victor Fogo), based upon a criminal complaint prepared by Your Affiant.

113.    Agents have reviewed a Lease Agreement pertaining to the premises located at **548 Bamboo Harbor Court, Apartment #205, Orlando, Florida** (The Woodlands Apartments). This document reflects that **Ainsworth BROWN** executed the lease beginning on or about July 1, 2002 and presently resides at this location by himself. On the lease application, **Ainsworth BROWN** indicated his former residence as 720 Chestnut Bay Court, #202, Orlando, Florida (also located within the Woodland Apartments). A residential telephone number of (407) 380-3550 is reflected for **Ainsworth BROWN** on this application. **Ainsworth BROWN** lists his employer as Harcourt, Inc. located at 6277 Sea Harbor Drive, Orlando, FL and his position as a shipping clerk. During your Affiant's investigation, surveillance agents have observed **Ainsworth BROWN** arrive at or depart from the premises located at **548 Bamboo Harbor Court, Apartment #205, Orlando, Florida** on more than one occasion. Agents have also observed **Ainsworth BROWN** depart from Harcourt, Inc.

114.    Agents have reviewed a Lease Agreement pertaining to the premises located at **5048 Eastwinds Drive, Orlando, Florida 32819** (West Winds Apartments). Information in this matter has established that **Jerry Vega ORTIZ** resides at this location. A Lincoln Navigator, bearing Florida license EJ2-67M, was utilized by **ORTIZ** in a delivery

113

of ecstasy tablets to **Bobby BELLAMY** and **Courtney BRADLEY** as noted above. This vehicle is registered to **ORTIZ** at the **5048 Eastwinds Drive** location. **ORTIZ**'s Florida Driver's License, issued on 01/11/2001, also reflects an address of **5048 Eastwinds Drive, Orlando, Florida**. During your Affiant's investigation, surveillance agents have observed the Lincoln Navigator parked in front of the **5048 Eastwinds Drive** location on more than one occasion. On or about December 18, 2001, DEA agents assigned to the Tampa, FL office observed this same Lincoln Navigator during an undercover meeting involving a pending drug transaction of 100 kilograms of cocaine. It is unknown at this time whether **ORTIZ** was present inside the Navigator on this occasion, but several suspects in the DEA Tampa investigation have either admitted to or have been implicated in the distribution of large quantities of ecstasy. **ORTIZ**'s NCIC record reveals arrests for the following drug-related offenses: (1) 01/29/1995 arrest for Smuggling Contraband into a Correctional Facility and Marijuana Possession with Intent to Distribute. On 04/07/1995, these charges were reduced and **ORTIZ** pled guilty to misdemeanor possession of marijuana; (2) 08/30/1996 arrest for Sale/Delivery of Marijuana and Delivery of a Scheduled III or IV Controlled Substance . On 01/14/1997, **ORTIZ** was convicted of a drug felony and was credited with 2 days county jail, followed by a term of 18 months probation; (3) 10/01/1998 arrest for Cocaine and Marijuana Possession With Intent to Deliver. On 03/15/1999, these charges were nolle prossed.

115.    Based upon the propensity of violence exhibited by members of the **Bobby BELLAMY** drug trafficking organization and the seizure of guns or other weapons from **Bobby BELLAMY** and direct associates, your Affiant respectively requests that law

enforcement agents be permitted to initiate the search at any of the above noted locations or premises at any time during the day or night. It is also requested that law enforcement officers be permitted to enter the premises without announcing their presence or purpose. These requests are to ensure officer safety during the execution of the search warrants sought in this matter.

116.      This concludes my affidavit.

_____
John Hegarty, Special Agent
U.S. Drug Enforcement Administration


Subscribed and sworn before
me this ___ day of August
2002

_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

115